CENTRAL ILLINOIS PUBLIC SERVICE
COMPANY, Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Respondent.

No. 78–1775.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 15, 1979.

Decided March 23, 1979.

David F. Peters, Richmond, Va., for petitioner.

Barbara Brandon, Dept. of Justice, Washington, D. C., for respondent.

Before FAIRCHILD, Chief Judge, CASTLE, Senior Circuit Judge, and WOOD, Circuit Judge.

CASTLE, Senior Circuit Judge.

The question presented is whether section 111(j) of the Clean Air Act, 42 U.S.C. § 7411(j), permits a company to apply for an innovative technology waiver of new source performance standards (NSPS) after putting into operation the new source[1] for which the waiver is sought. The Administrator of the Environmental Protection Agency, believing himself bound by the statute, denied a waiver in this situation on the ground of untimely application. We conclude that the statute does not require application prior to startup of the source and hence remand to the Administrator for the exercise of his discretion.

In August, 1973, Central Illinois Public Service Company (CIPS) commenced construction of a coal-fired generator near Newton, Illinois. In September, 1977, the generator was started up[2] even though the innovative double alkali flue gas desulfurization (DAFGD) system for control of sulfur dioxide emissions had not yet been completed. The month preceding startup, new amendments to the Clean Air Act became effective, under which new sources experimenting with innovative emission control systems could apply for a waiver from the performance standard normally applicable to the source.[3] On August 4, 1977, prior to

---

1. A "new source" is any facility which emits or may emit any air pollutant, the construction of which is commenced after the publication of a performance standard applicable to such source. 42 U.S.C. §§ 7411(a)(2) and (a)(3).

2. The generator was not put into commercial operation until November, 1977, however it was "started up" for purposes of the regulations when it was test-fired in September. See 40 C.F.R. § 60.2(o). CIPS accepted this interpretation at oral argument.

3. The Newton unit was clearly a "new source," even though constructed prior to the effective

date of section 111(j), since it was constructed after the publication (in 1971) of performance standards for coal-fired boilers. See 36 Fed. Reg. 24876 (Dec. 23, 1971). The DAFGD system was eligible for an innovative technology waiver as it had never been tested on a facility as large as the Newton generator. The waiver, if obtained, could have authorized operation of the generator pending completion of the DAFGD system since the untreated emissions from the unit did not violate national ambient air quality standards for the protection of the public health and safety. See 42 U.S.C. § 7411(j)(1)(B). Once the emission control sys-

startup of the Newton generator, the EPA had notified CIPS that it would be in violation of federal and state sulfur dioxide emission limits upon startup of the generator. After receiving this notice, CIPS had engaged in informal discussions with the EPA concerning the appropriate course of action, but it did not formally apply for a section 111(j) waiver of new source performance standards until January 30, 1978. By letter of April 26, 1978, the Administrator of EPA denied the waiver request on the ground that it was untimely under the terms of section 111(j). It is this final determination of the Administrator which is now under review. We conclude that the statute did not bind him to dismiss the waiver request as untimely and accordingly remand to the Administrator for the exercise of his discretion.

> Section 111(j) of the Clean Air Act states: (1)(A) Any person proposing to own or operate a new source may request the Administrator for one or more waivers from the requirements of this section for such source or any portion thereof with respect to any air pollutant to encourage the use of an innovative technological system or systems of continuous emission reduction. The Administrator may, with the consent of the Governor of the State in which the source is to be located, grant a waiver under this paragraph, if the Administrator determines . . . that [the "proposed system" satisfies certain statutory criteria.]

42 U.S.C. § 7411(j)(1)(A). The section also provides that the owner or operator of the "proposed source" must demonstrate that the proposed system will not endanger the public health, welfare, or safety. Based on the language "proposing to own or operate," "is to be located," "proposed system," and "proposed source," the Administrator concluded that a company already operating a new source could not apply for a waiver. Apparently he interpreted the language to require application during the proposal stage of the project, which would clearly bar an application made after the project had already commenced operations. We do not believe that the language can be given this literal interpretation, however, because a project becomes more than a proposal once construction commences, yet the EPA agrees that application for a waiver may be made during construction. EPA Brief at 13. If application is not restricted to the proposal stage, the rationale for the Administrator's denial of a post-startup application falls. Moreover, even if the cited language is construed as impliedly providing for pre-startup application, such a provision would at most be directory rather than mandatory as startup *per se* has no substantive significance to waiver eligibility.[4] Startup in violation of emission limits would be significant in view of the prohibition of section 111(e),[5] however the Administrator's decision relied neither on the latter section nor on the fact that the Newton unit was in violation of NSPS at the time of application. We therefore express no view at this time on whether section 111(e) would bar grant of a waiver to a company applying when already in violation.

We do not consider the legislative history relevant to the present issue as one senator's citation by way of example of the New Mexico utility's situation does not imply that his colleagues, or even the senator in question, intended the legislation to cover the variety of problems faced by that utili-

---

tem was operating, a waiver could also have permitted emissions in excess of NSPS for a limited period in the event the DAFGD system did not prove as effective as anticipated.

4. The general rule of statutory construction is that if a provision relates to the essence of the thing to be done so that noncompliance will frustrate the legislative intent, it is mandatory. On the other hand, if a provision relates to a detail of procedure rather than to substance, it is directory.

*Van Keppel v. United States*, 206 F.Supp. 42, 44 (D.Kan.1962).

5. (e) After the effective date of standards of performance promulgated under this section, it shall be unlawful for any owner or operator of any new source to operate such source in violation of any standard of performance applicable to such source.

42 U.S.C. § 7411(e).

638

ty. This is particularly so as Congress presumably knew that the New Mexico utility could obtain relief by entering into a consent decree with the EPA,[6] so there is no reason to assume that it intended the 1977 amendments to cover that utility's situation.

Reversed and Remanded.

---

6. The Public Service Company of New Mexico did in fact enter into a consent decree with the EPA. This option was no longer available to CIPS after the 1977 amendments.