**STATE OF NEW YORK, et al., Plaintiffs,**

v.

**Lee M. THOMAS, et al., Defendants.**

Civ. A. No. 84–0853.

United States District Court, District of Columbia.

July 26, 1985.

Howard Fox, Sierra Club Legal Defense Fund, Washington, D.C., for plaintiffs, Sierra Club Legal Defense Fund.

David R. Wooley, Asst. Atty. Gen., N.Y. State Dept. of Law, Albany, N.Y., for State of N.Y.

Thomas Y. Au, Harrisburg, Pa., for State of Pa.

H. Cabanne Howard, James T. Kilbreth, Gregory Sample, Asst. Attys. Gen., Augusta, Me., for State of Me.

Lee Breckenridge, Asst. Atty. Gen., Environmental Protection Div., Boston, Mass., for State of Mass.

George D. Bisbee, Asst. Atty. Gen., Environmental Protection Div., Concord, N.H., for plaintiffs State of N.H.

Kenneth S. Kamlet, Washington, D.C., for National Wildlife Federation.

J. Wallace Malley, Jr., Asst. Atty. Gen., Montpelier, Vt., for State of Vermont.

Paul H. Schneider, Deputy Atty. Gen., Richard J. Hughes, Justice Complex, Trenton, N.J., for State of N.J.

Charles E. DiLeva, Asst. Atty. Gen., Providence, R.I., for State of R.I.

Robert A. Whitehead, Asst. Atty. Gen., Hartford, Conn., for State of Conn.

Jose R. Allen, D.J., Catherine A. Cotter, D.J., Land & Natural Resources Div., Washington, D.C., for William Ruckelshaus.

Michael B. Barr, Washington, D.C., for Alabama Power Co.

Charles D. Ossola, Washington, D.C., for National Coal Association.

Francis S. Blake, E. Donald Elliot, Vern R. Walker, Washington, D.C., for Cincinnati Gas & Electric.

Faith A. LaSalle, Asst. Atty. Gen., Providence, R.I., amicus curiae, State of R.I.

Lisa R. Tiegel, Sp. Asst. Atty. Gen., Roseville, Minn., for State of Minn.

MEMORANDUM OPINION

NORMA HOLLOWAY JOHNSON, District Judge.

Before the Court are a motion for summary judgment filed by plaintiffs and motions for summary judgment and to dismiss filed by defendant and defendant-intervenors in this action to compel the Administrator of the Environmental Protection Agency (EPA) to perform certain duties under the Clean Air Act, 42 U.S.C. § 7401 et seq. (1977). Plaintiffs are six states, four environmental associations, and four individuals who seek to alleviate damage occurring in eastern Canada allegedly caused by the international movement of harmful pollutants originating in the midwestern United States. Defendant is the Administrator of the EPA and is sued in his capacity as such. The National Coal Association and several industrial power companies were granted leave to intervene in these proceedings and filed briefs in support of defendant's motion to dismiss and for summary judgment. Plaintiffs seek an order compelling the Administrator to require emitting states to revise their State Implementation Plans (SIP's), as mandated under section 115 of the Clean Air Act, 42 U.S.C. § 7415, in order to abate the damage allegedly traceable to the transboundary air pollution.

I. FACTUAL BACKGROUND

This action has its origin in a letter written during the final days of the Carter Administration from Douglas M. Costle, then Administrator of the EPA, to former Secretary of State Edmund Muskie (Appendix A). This letter, dated January 13, 1981, concluded in part that "acid deposition is endangering public welfare in the U.S. and Canada and ... U.S. and Canadian sources contribute to the problem not only in the country where they are located but also in the neighboring country." Costle stated in the letter that his conclusion was based on a report issued by the International Joint Commission. Additionally, in his letter, Costle analyzed legislative provisions similar to section 115 passed by the Canadian Legislature on December 17, 1980, and concluded that these provisions afforded the United States essentially the same rights as Canada was given under United States law. Costle reiterated and expanded upon his conclusions in a letter sent to Senator George Mitchell (Appendix B) on January 13, 1981, and issued his findings in a press release dated January 16, 1981. Plaintiffs contend that the determinations made by Costle were sufficient to invoke section 115 of the Clean Air Act which, plaintiffs urge, sets in motion a process culminating in revision of SIP's by polluting states. No

Administrator, however, has issued formal notification to the governor of any state from which such emissions originate, as would be required by the statute. Indeed, former Administrators Gorsuch and Ruckelshaus have stated their belief that Costle's actions were insufficient to invoke section 115. Whether section 115 applies in this case—and, if so, its effect—is at controversy in the present action.

Section 115 provides in pertinent part:

(a) Whenever the Administrator, upon receipt of reports, surveys or studies from any duly constituted international agency has reason to believe that any air pollutant or pollutants emitted in the United States cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare in a foreign country or whenever the Secretary of State requests him to do so with respect to such pollution which the Secretary of State alleges is of such a nature, the Administrator shall give formal notification thereof to the Governor of the State in which such emissions originate.

(b) The notice of the Administrator shall be deemed to be a finding under section 7410(a)(2)(H)(ii) of this title which requires a plan revision with respect to so much of the applicable implementation plan as is inadequate to prevent or eliminate the endangerment referred to in subsection (a) of this section. Any foreign country so affected by such emission of pollutant or pollutants shall be invited to appear at any public hearing associated with any revision of the appropriate portion of the applicable implementation plan.

(c) This section shall apply only to a foreign country which the Administrator determines has given the United States essentially the same rights with respect to the prevention or control of air pollution occurring in that country as is given that country by this section.

42 U.S.C. § 7415(a)–(c).

## II. JUSTICIABILITY

### A. *Statutory Basis for Jurisdiction*

■ The Clean Air Act contains a citizen suit provision to permit enforcement of required actions under the Act by private citizens. This section states:

Except as provided in subsection (b), any person may commence a civil action on his own behalf ... against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this Act which is not discretionary with the Administrator.... (b) *Notice.* No action may be commenced ... prior to 60 days after the plaintiff has given notice of such action to the Administrator....

42 U.S.C. § 7604.

Plaintiffs allege that under section 115 the Administrator is charged with performing a mandatory duty and due notice having been served upon him, they thus invoke jurisdiction under the citizen suit section. Whether the duties of the Administrator under section 115 are mandatory or discretionary is discussed more fully in Part III of this opinion, *see infra* pp. 1485–1486; however, as the Court concludes that the duties are mandatory, jurisdiction of this action properly lies in the district court under 42 U.S.C. § 7604. *See Kennecott Copper Corporation, Nevada Mines Division, McGill, Nevada v. Costle,* 572 F.2d 1349 (9th Cir.1978).

### B. *Applicability of TRAC*

■ Intervenors argue further that, notwithstanding the provisions of 42 U.S.C. § 7604, jurisdiction of this action is exclusively vested in the United States Court of Appeals for the District of Columbia Circuit based on that court's recent decision in *Telecommunications Research and Action Center v. Federal Communications Commission,* 750 F.2d 70 (D.C.Cir.1984) (TRAC). Specifically, intervenors argue that under *TRAC* any action or inaction by

the Administrator with respect to the Costle letters is reviewable only in the Court of Appeals for this Circuit pursuant to section 307 of the Clean Air Act. Section 307 provides for direct review by the court of appeals of "final action taken" in specific and enumerated instances. See 42 U.S.C. § 7607(b)(1). However, as the subject of the instant complaint is not "final action" and is not included among the specific statutory bases for appellate court jurisdiction, section 307 cannot apply.

Intervenors' reliance on *TRAC* is misplaced. Plaintiff in *TRAC* claimed that the FCC unreasonably delayed making a determination that AT & T was required to reimburse ratepayers for allegedly unlawful overcharges. Under the applicable statute, exclusive jurisdiction was conferred upon the court of appeals to determine the validity of "all final orders of the Federal Communications Commission." 28 U.S.C. § 2342(1) (1982); 47 U.S.C. § 402(a) (1982). The court of appeals held that its jurisdiction was exclusive over nonfinal matters as well by virtue of the exclusive jurisdiction provision coupled with the All Writs Act, 28 U.S.C. § 1651(a) (1982). The All Writs Act empowers federal courts to issue writs necessary to aid their respective jurisdictions. The court held that its authority would "extend[] to support an ultimate power of review, even though it is not immediately and directly involved." 750 F.2d at 76.

The present case differs markedly from *TRAC.* Rather than vesting ultimate review in the court of appeals, the Clean Air Act specifically defines the role the district courts are to play in its enforcement. Plaintiffs do not seek review of final agency action which would be cognizable under section 307. They seek review of an alleged failure to take action alleged to be mandatory. Although Costle's acts fall short of final action—as was the case in *TRAC*—there is no need—and, indeed, no authority—for the court of appeals to protect its prospective jurisdiction. The review of the failure to perform a nondiscretionary act is vested in the district court under section 304. The EPA, which argues contrarily to intervenors with respect to this issue, urges in its surreply that inter-

venors "can only read *TRAC* into this case by reading section 304 out of the Clean Air Act." EPA Surreply at 2. As this claim is properly before the Court under section 304, the Court now proceeds to determine whether a justiciable controversy has been presented.

## C. *Subject Matter Jurisdiction*

Defendants have moved to dismiss the complaint for lack of subject matter jurisdiction. The Court has reviewed the alternative bases for dismissal and concludes that plaintiffs have alleged material facts sufficient to sustain their claim that the court possesses subject matter jurisdiction.

■ Article III of the United States Constitution defines and limits the jurisdiction of United States courts, stating in part that the judicial power shall extend only to cases and controversies. *Hall v. Beals,* 396 U.S. 45, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969). This constitutional requirement has been interpreted by the United States Supreme Court to mean that a plaintiff seeking redress must allege:

a. threatened or actual direct injury resulting from the putatively illegal action; and

b. an injury that can be fairly traced to the challenged action that is likely to be redressed by a favorable decision.

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) ("*Valley Forge*") [quoting *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1976) ]. *Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2204–05, 45 L.Ed.2d 343 (1975); *Linda R.S. v. Richard D.,* 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973); *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

■ These requirements assume constitutional stature because they tend to ensure "a concrete factual context conducive to a realistic appreciation of the conse-

quences of judicial action." *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758. Thus, even where Congress creates a statutory right of action, as it has through section 304, a litigant suing under such a statute may vindicate his claim only if he meets the constitutional requirements articulated above, although a statutory right of action will excuse a litigant from meeting the federal common law "prudential" requirement of justiciability. *Warth v. Seldin,* 422 U.S. at 501, 95 S.Ct. at 2206. *See also Valley Forge,* 454 U.S. at 487–88 n. 24, 102 S.Ct. at 766–67 n. 24.

### 1. *General Principles*

Section 304 of the Clean Air Act, as noted above, provides that "any person" may commence a civil action to compel the Administrator to undertake action under the Act which is not discretionary. Under section 302 of the Act, person is defined to include "an individual, corporation, partnership, association [or] State...." Thus, all of the plaintiffs who have joined in this action have statutorily cognizable claims. In addition, all plaintiffs except Representative Ottinger have presented facts sufficient to meet the constitutional requirements discussed above.

■ The state plaintiffs in this action seek enforcement not only for their citizens but on their own behalf. Although states frequently sue under the doctrine of *parens patriae,* it is not uncommon for them also to maintain their own actions. The Supreme Court has countenanced this procedure by holding in a related context that states may rely on such statutes to establish standing to challenge federal executive action. *Wisconsin v. Federal Power Commission,* 373 U.S. 294, 83 S.Ct. 1266, 10 L.Ed.2d 357 (1963) (state permitted to sue under the Natural Gas Act without meeting *parens patriae* criteria); *Phillips Petroleum Company v. Wisconsin,* 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954); *Pennsylvania v. Kleppe,* 533 F.2d 668 (D.C.Cir.1976) *cert. denied,* 429 U.S. 977, 97 S.Ct. 485, 50 L.Ed.2d 584; *see also Hancock v. Train,* 426 U.S. 167, 196, 96 S.Ct. 2006, 2020, 48 L.Ed.2d 555 (1976) (section 304 of the Clean Air Act "is the only means provided by the Act for the States to remedy noncompliance").

■ The citizen group plaintiffs sue on behalf of themselves and on behalf of their members "who reside in areas throughout the midwestern and northeastern states and eastern Canada and breathe air pollution and suffer the other types of acid rain damages which are the subject of this action." Complaint at 4. Defendants argue that plaintiff associations have failed to allege that the associations or their members had been adversely affected by the inaction of the Administrator, relying principally on *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) and *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343. These cases, however, do not prove defendants' contention. In *Sierra Club v. Morton,* plaintiff sued to obtain judicial review of action by the United States Forest Service approving recreational development in the Sierra Nevada Mountains. The Supreme Court denied standing to the plaintiff because it "failed to allege that it or its members would be affected in any of their activities or pastimes...." 405 U.S. at 735, 92 S.Ct. at 1366. In the present case, however, the plaintiffs have alleged not only that emissions from the polluting states have adversely affected eastern Canada, but also have alleged and supported with documentation that its members live, work, vacation, or own property in eastern Canada.

Moreover, in *Warth,* the Supreme Court recognized that an association may assert the rights of its members, but denied standing to the associated because none of them have *sufficiently* alleged cognizable injury. In this case, plaintiff associations have alleged with particularity that many of its members have suffered or will suffer concrete harm as a result of the putatively illegal inaction. Unlike *Warth,* which involved a tenuous causal link between the alleged illegality and the alleged harm, the present case involves alleged inaction which, if cured, may lead directly to reduced emissions and thus reduced harm. Plaintiffs have quite clearly stated that

"respirable particulates and deposition of acidic materials are causing substantial and irreversible damage to the health and welfare of the people of the plaintiff states, plaintiff organizations, and the individual plaintiff." Complaint at 1–2.

■ The individual plaintiffs, with the exception of Representative Ottinger, also have alleged material facts sufficient to enable them to proceed as plaintiffs in this action. These plaintiffs own property in the Muskoka Lake area of Ontario and allege that their "air and water quality and personal property have been damaged by air pollution emitted from certain Midwestern States." Complaint at 5. Although defendants have countered that these plaintiffs have failed to specify any adverse effects that have impaired the use of their property, the Court is of the opinion that this is not required. Plaintiffs have alleged that their health and property have been placed in jeopardy by the pollutants. Further, the fact of their presence in a geographical region harmed by the Administrator's alleged inaction is sufficient to confer upon them a cognizable interest. *See Sierra Club v. Morton*, 405 U.S. at 734, 92 S.Ct. at 1366 ("[a]esthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process").

■ Representative Ottinger asserts a cognizable interest by virtue of his position as a Member of Congress. However, there are no special standards for determining congressional standing. As Representative Ottinger has not alleged any property interest or personal presence in the affected areas, and has not alleged other facts which entitle him to invoke the Court's jurisdiction, his complaint is merely a generalized grievance shared equally with all citizens. However, as the other plaintiffs have alleged claims sufficient to invoke the Court's jurisdiction, Ottinger may remain in the action. *See Watt v. Energy Action Educational Foundation*, 454 U.S. 151, 160, 102 S.Ct. 205, 212, 70 L.Ed.2d 309

(1981); *Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252, 264 n. 9, 97 S.Ct. 555, 563 n. 9, 50 L.Ed.2d 450 (1977).

2. *Direct Injury*

■ In addition to presenting properly cognizable claims in their representative or individual capacities, plaintiffs also have alleged cognizable direct injury sufficient to meet the constitutional requirement of direct injury. As noted above, environmental harm is a legally redressable injury. *Sierra Club v. Morton*, 405 U.S. at 734, 92 S.Ct. at 1366. Further, although defendants object that plaintiffs have not presented specific evidence of identifiable harm that has befallen them, legally recognizable harm may be retrospective or prospective in nature. *See United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254 (1973) ("SCRAP") *See also Linda R.S. v. Richard D.*, 410 U.S. at 617, 93 S.Ct. at 1148 ("Although the law of standing has been greatly changed in the last 10 years, we have steadfastly adhered to the requirement that, at least in the absence of a statute expressly conferring standing, federal plaintiffs must allege some *threatened or actual injury* resulting from the putatively illegal action before a federal court may assume jurisdiction") (emphasis added) (citations omitted). Since emissions from polluters in the midwestern United States may cause damage to air quality, water quality, and property in Canada, areas in which plaintiffs' citizens or members live, work, vacation or own property, plaintiffs have alleged threatened or actual injury sufficient to establish standing. *See Friends of the Earth v. Potomac Electric Power Company*, 419 F.Supp. 528, 530 (D.D.C. 1976) (association found to have standing to sue under the Clean Air Act to abate pollution in Washington, D.C. where 430 of its 28,000 members resided or worked in Washington and thus breathed and were harmed by pollution).

### 3. Traceability and Redressability

Article III requires that the injury complained of be fairly traced to the challenged action and that the harm involved be likely to be redressed by judicial intervention. As plaintiffs correctly noted, traceability and redressability "are inseparable in the present case because the relief plaintiffs seek is an order compelling the EPA to end the very inaction which is the cause of plaintiffs' injuries." Plaintiffs' Memorandum of Points and Authorities at 41. These questions are problematic in the area of acid precipitation because of political and scientific dispute over the extent to which acid rain causes damage to aquatic ecosystems, terrestrial ecosystems, animal health, human health, or artifacts. See generally Carroll, Acid Rain: An Issue in Canadian-American Relations (Toronto and Washington: 1982). Defendants in this case contend that plaintiffs have failed to establish a causal link between EPA inaction and the aggravated harm in Canada. They argue that, even if EPA is required to act, "it would be difficult, if not impossible, to identify facilities causing international pollution over hundreds of kilometers." Memorandum In Opposition to Plaintiffs' Motion for Summary Judgment at 19. This argument, however, is little more than an assertion that EPA is unable or unwilling to do what Congress has mandated it must do. Indeed, at the heart of section 115 is the congressional determination that the revision of state implementation plans is an effective mechanism for abatement of international air pollution. See S.Rep. No. 127, 95th Cong. 1st Sess. 57 (1977), U.S.Code Cong. & Admin.News 1977, p. 1077. See also Animal Welfare Institute v. Kreps, 561 F.2d 1002, 1010 (D.C.Cir.1977), cert. denied, 434 U.S. 1013, 98 S.Ct. 726, 54 L.Ed.2d 756 (1978) (by enacting remedial measures under the Marine Mammal Protection Act, Congress determined that a causal relationship existed between American import practices and South African sealing practices). As the language of section 115 clearly indicates that a reduction in emissions will abate the deleterious effects of midwestern pollution on public health and welfare in Canada, the Court concludes that the constitutional requirements of traceability and redressability have been satisfied. Moreover, the United States Court of Appeals for the District of Columbia Circuit has held that the "redressability requirement" is to be construed broadly in favor of plaintiffs:

> [B]ecause the relevant inquiry is directed to the effect of a future act (the court's grant of the requested relief) it would be unreasonable to require the plaintiff to prove that granting the requested relief is certain to alleviate his injury. Furthermore, as cases such as the present one show, litigation often 'present[s] complex interrelationships between private and government activity that make difficult absolute proof that the harm will be removed.' Thus, a court should be careful not to require too much from a plaintiff attempting to show redressability, lest it abdicate its responsibility of granting relief to those injured by illegal government action.

Community Nutrition Institute v. Block, 698 F.2d 1239, 1248 (D.C.Cir.1983) (citations omitted), rev'd on other grounds, — U.S. ——, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984). Accord: International Ladies' Garment Workers' Union v. Donovan, 722 F.2d 795, 811 n. 27 (D.C.Cir.1983); cert. denied, — U.S. ——, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984). Moreover, plaintiff need not show that the injury would be completely redressed, so long as " 'the requested relief would benefit [them] in some perceptible, tangible fashion.' " Sierra Club v. Edwards, 19 Envir.Rep. (BNA) 1357, 1366 (D.D.C.1983) (citing Public Citizen v. Lockheed Aircraft Corporation, 565 F.2d 708, 715 (D.C.Cir.1977). Therefore, there is no basis to conclude that the injury is not likely to be redressed by a favorable decision. Having concluded that the plaintiffs have presented a justiciable controversy, the Court now turns its attention to the merits of the action.

### III. ANALYSIS OF THE SECTION 115 CLAIM

The task before the Court now is to determine if the requirements of section

115 have been satisfied and, if so, what action is required by the Administrator under the statute.

### A. Whether Section 115 Has Been Satisfied

#### 1. Receipt of Reports

■ "The initial requirement under section 115 is that the Administrator receive a report from a duly constituted international agency ...." 42 U.S.C. § 7415. Costle stated in his letter to Secretary Muskie that he examined in connection with his consideration of the United States-Canada acid rain issue the *Seventh Annual Report on Great Lakes Water Quality*, issued in October 1980 by the International Joint Commission. Costle averred that this report "confirms that acid deposition is endangering public welfare in the U.S. and Canada...." It thus appears that his determination was made "upon receipt" of the IJC report. Therefore, the only question remaining is whether the IJC is a duly constituted international agency.

Although the phrase "duly constituted international agency" is not defined in the Act or in the legislative history, the IJC would meet the expectations of the drafters of this section. The Commission, established by the Boundary Waters Treaty of 1909, United States-Canada, 36 Stat. 2448, T.S. No. 548 (effective May 13, 1910), is charged with the responsibility of resolving transboundary water and navigational disputes between the United States and Canada. It includes the approval of applications for the use, obstruction, or diversion of water which would affect the natural level or flow of water on the other side of the boundary and the investigation of disputes involving United States-Canada boundaries. *See generally* B. Caplan, *The Applicability of Clean Air Act Section 115 To Canada's Transboundary Acid Precipitation Problem*, 11 B.C.Envtl.Aff. L.Rev. 539, 580–82 (1984). Based on these characteristics of the Commission and the apparent agreement by the parties that the agency is duly constituted, the Court concludes that the Costle determination was made "upon receipt of reports, surveys or studies from any duly constituted international agency...."

#### 2. Reason to Believe

■ In order to trigger invocation of section 115, the Administrator must have "reason to believe that any air pollutant or pollutants emitted in the United States cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare in a foreign country ...."

The IJC Report, upon which Administrator Costle in part based his decision, concludes that:

"transmission of toxic and hazardous substances to the Great Lakes via long range atmospheric transport and deposition is a serious problem which requires further research efforts and control measures .... All parts of the Great Lakes watershed are now receiving precipitation containing 5 to 40 times more acid than would occur in the absence of atmospheric emissions."

Based on these findings, the Commission recommended "appropriate actions to substantially reduce atmosphere emissions of sulphur and nitrogen oxides from existing as well as new sources...."

The Clean Air Act does not specifically state what is necessary for the Administrator to have "reason to believe," but the IJC Report would have afforded Costle ample basis upon which to conclude that air pollutants in the United States contribute to acid precipitation occurring in Canada such that it could reasonably be anticipated that the public health and welfare of Canada would be endangered. Indeed, that is exactly what Costle believed, for he specifically stated that "the IJC Report confirms that acid deposition is endangering public welfare in the United States and Canada and that the United States and Canadian sources contribute to the problem not only in the country where they are located but also in the neighboring country."

Defendants argue that Costle's findings are ambiguous and do not satisfy the requirements of section 115. They contend

that Costle only made the finding that "the *cumulative effects* of Canadian and the United States emissions are creating a risk of public harm in Canada." EPA Motion to Dismiss at 29. This argument, however, cannot be reconciled with Costle's statements. In the letter to Senator Mitchell, Costle stated:

The relative contribution of U.S. and Canadian emission sources to acid deposition problems in the U.S. and Canada varies widely from location to location.... Surveys conducted over the past several years establish that there is a significant flow of these pollutants across the U.S.-Canadian border in both directions. Thus, we can say with some certainty that emission sources in the U.S. contribute significantly to the atmospheric loadings over some sensitive areas in Canada and that emission sources in Canada contribute significantly to the loadings over some sensitive areas in the United States.

Plaintiffs' Exhibit 1–E at 2–3.

It was based on this information that Costle had reason to believe that "U.S. and Canadian sources contribute to the problem not only in the country where they are located but also in the neighboring country." Therefore, this requirement of the statute is satisfied.

### 3. Reciprocity

█ In addition, section 115 requires that its provisions be invoked only where the Administrator has determined that the foreign country involved afford to the United States essentially the same rights that the United States grants it with respect to international air pollution.

Under section 21.1 of the Canadian legislation, if the Minister of Environment has reason to believe that Canadian contaminants contribute to air pollution which may reasonably be expected to constitute a significant danger to the health, safety, or welfare of persons in another country, the Minister shall recommend to the Governor in Council specific emission standards appropriate to reduce the damage. Additionally, the statute requires the Minister of Environment to consult with the province where the source of the international air pollution is located and provides that a particular province can act to remedy air pollution affecting a foreign country much in the same way that a state might revise its SIP's under section 115(b).

Costle discussed the Canadian law provisions and their effect on the issue of reciprocity in the letters he wrote to Secretary Muskie and Senator Mitchell. Costle concludes that "the amendments to the Canadian Clean Air Act do give adequate authority to the Government of Canada to provide essentially the same rights to the United States as Section 115 provides to Canada." However, Costle qualifies this conclusion by characterizing the reciprocity determination as a fluid and dynamic situation that is subject to change. He states that his determination "could be changed should the U.S. conclude that future Canadian actions interpreting or implementing their legislation were not giving essentially the same rights to the U.S." In addition, Costle emphasizes that at the time of any final action, "the Administrator must continue to be able to find that Canada is giving the United States essentially the same rights ...."

Defendants urge that Costle merely opines on whether the Canadian legislation provides reciprocal rights to the United States. Defendants cite to Costle's language that his determination is not "permanently binding...." However, this merely underscores the reality that a finding under the statute must be based on an analysis of facts and law as they exist at a particular time and that a change of either facts or law might require reexamination of the determination. Moreover, should defendants wish to challenge Costle's findings, the appropriate time and forum would be after a final action has been taken by the Administrator in an action commenced in the court of appeals. 42 U.S.C. § 7607.

Based on its review of Costle's letters, the Court concludes that Costle did in January 1981 satisfy the section 115 requirement that "the Administrator determine[ ]

[that Canada give[s]] the United States essentially the same rights with respect to the prevention or control of air pollution occurring in that country as is given that country by this section." However, the Court is concerned by Costle's own qualifications of his conclusion, aggravated in this case by the lengthy passage of time since the determination was made. Therefore, the Court will afford the current EPA Administrator an opportunity to review the issue of reciprocity to determine whether Costle's conclusion remains viable.

### B. The Effect of a Finding That Section 115 Has Been Invoked

■ Under section 115, once the formal requirements of the statute have been met, "the Administrator shall give formal notification thereof to the Governor of the State in which such emissions originate." 42 U.S.C. § 7415(a). This notice "shall be deemed to be a finding ... which requires a plan revision with respect to so much of the applicable implementation plan as is inadequate to prevent or eliminate the endangerment referred to in subsection (a)." 42 U.S.C. § 7415(b).*

Defendants attack the legal significance of Costle's findings on three bases. First, they argue that Costle's findings did not constitute official decision-making. Second, they contend that Costle's actions were revoked by the actions of his successor, Administrator Gorsuch. Third, defendants urge that the decision to act un-

der section 115, even once the necessary findings have been made, is discretionary.

### 1. Official Decision-Making

■ With respect to whether Costle made official determinations, defendants note that Costle's determination was made by letter and argue that letters cannot constitute formal administrative decision-making. Defendants suggest that another method, for example, publishing the letters in the Federal Register, would have given the determinations the characteristics of official action.

Plaintiffs reply that the letters have all the attributes of official agency action because they were written to the Secretary of State, who is charged with administering foreign relations and because they were publicized as agency action in a press release. Plaintiffs cite other examples of official EPA action which was taken by communicating through correspondence. The Court concludes that the fact that Costle memorialized his findings in a letter does not defeat their classification as official agency action. It appears that publication in the Federal Register would be inappropriate for this kind of action because it is not a rule or policy statement. 5 U.S.C. §§ 552(a)(1) and 553(b). Additionally, notification to the Governors would presumably be achieved by letter. That the Administrator chose this medium to make his findings should not frustrate the Administrator's intent to secure compliance by the states.**

---

\* The Court notes that the states to which notification is due were not identified by Costle. Costle instructed his staff to determine which states were to be targeted, but no final action was taken. The Court is convinced that the obligation to identify the polluting states is incidental to giving formal notification and not a prerequisite to the conclusion that Costle made the requisite findings under section 115. The construction of section 115 and Costle's description of the statute in his letter to Secretary Muskie illustrate that section 115 is triggered once the Administrator receives qualified reports that give him reason to believe United States sources are polluting Canada and the Administrator makes the requisite finding of reciprocity.

\*\* Correspondence is frequently used by EPA to take formal action under the Clean Air Act. For

example, notification to owners of major pollution sources that are subject to particular emission control requirements is frequently accomplished by correspondence. *See Harrison v. PPG Industries,* 446 U.S. 578, 582, 100 S.Ct. 1889, 1892, 64 L.Ed.2d 525 (1980); *Hawaiian Electric Company v. EPA,* 723 F.2d 1440, 1442 (9th Cir. 1984). Determinations that a source is not in compliance with emission control requirements under 42 U.S.C. § 7413 of the Act is accomplished by correspondence. *Wisconsin's Environmental Decade, Inc. v. Wisconsin Power and Light Co.,* 395 F.Supp. 313 (W.D.Wis.1975). Waivers by the Administrator of "new source performance standards" under 42 U.S.C. 7411(j) have been denied to operators of emission sources by way of correspondence. *Central Illinois Public Service Co. v. U.S. EPA,* 594 F.2d 636, 637 (7th Cir.1979).

## 2. Revocation

 Defendants also argue that whatever determinations Costle made were revoked by Administrator Gorsuch in a letter she sent to the Governor of Ohio on September 22, 1981. In this letter, Gorsuch assured Governor Rhodes that Costle's letter did not satisfy section 115 and that the letter was void of legal significance. *See* Defendants' Exhibit 1.

Plaintiffs counter that while Gorsuch made a legal conclusion of the effect of the letter, she did not review the factual bases for the determination nor suggest that these determinations were erroneous. This kind of factual review appears to have been necessary under the ordinary procedure that an Administrator employs to avoid being bound by the decisions of a predecessor. *See* EPA Exhibit 6 ("a new Administrator could "reconsider" or "make different findings"). Gorsuch made no such factual findings. She did not address the relevant facts which would have been considered in revoking the prior administrative findings. She did not refer to any change of circumstances which would call into question the adequacy of Canadian law to provide rights to the United States. She did not address any changes in scientific evidence demonstrating the cessation of adverse impacts in Canada from U.S. emissions. Therefore, it cannot be concluded that the Gorsuch letter revoked the Costle determination that section 115 was applicable. *See Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Company*, 463 U.S. 29, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) ("Revocation constitutes a reversal of the agency's former views as to the proper course. A 'settled course of behavior embodies the agency's informed judgment that, by pursuing that course, it will carry out the policies committed to it by Congress. There is, then, at least a presumption that those policies will be carried out best if the settled rule is adhered to.' Accordingly, an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance") (citations omitted).

## 3. Discretionary Act

Third, defendants urge that the decision to act under section 115 is discretionary. The Court notes that this is really a jurisdictional argument because section 304 jurisdiction exists in the district court only to challenge mandatory duties that the Administrator has failed to perform. Nevertheless, defendants urge that, even if Costle made the requisite findings under the statute, the decision whether to notify the Governors or to take any additional steps under section 115 is discretionary.

Defendants' argument finds no support either in the statute and its legislative history or in the relevant case law. The plain language of section 115 is clear: whenever the Administrator makes the findings set forth in the statute, "the Administrator *shall* give formal notification thereof to the Governor of the State in which such emissions originate" (emphasis added). As reiterated by the United States Court of Appeals for the District of Columbia Circuit, when the Clean Air Act uses "shall," the normal inference is that the act is mandatory. *Oljato Chapter of the Navajo Tribe v. Train*, 515 F.2d 654, 664 (D.C.Cir.1975). *See also Anderson v. Yungkau*, 329 U.S. 482, 485, 67 S.Ct. 428, 430, 91 L.Ed. 436 (1947). In addition, the *Report of the Committee on Public Works* of the United States Senate concluded that "[s]ection 115, as revised, therefore, provides that the determination that emissions of air pollutants in the United States are endangering the health or welfare of citizens of a foreign country *will require* the State in which the source of those emissions is located to revise its implementation plan to control those emissions." *Senate Comm. on Public Works, Clean Air Amendments of 1976*, S.Rep. No. 717, 94th Cong., 2d Sess. (1976).

Defendants argue that a section 115 decision must be discretionary because it "requires the fusion of technical knowledge and skills with judgment which is the hall-

mark of duties which are discretionary." Intervenors' Memorandum of Points and Authorities at 17 (quoting *Kennecott Copper Corporation, Nevada Mines Division, McGill, Nevada v. Costle,* 572 F.2d 1349 (9th Cir.1978) ("*Kennecott*")). However, the cases upon which defendants rely and other relevant cases suggest that discretion exists in the Administrator to determine only the *manner* in which the duty is to be executed, not whether it is to be executed. In *Kennecott,* for example, the court held that it did not have jurisdiction under section 304 of the Clean Air Act because the plaintiff sought review of a discretionary action. Specifically, plaintiff sought a declaratory judgment that it had satisfied the Act by making certain improvements. Plaintiff relied on section 110(a)(3) of the Act, which states that the Administrator "shall approve" any revision meeting the statutory requirements, to contend that the Administrator was under a mandatory duty to approve a variance. However, the Court held that determining whether a SIP met the requirements was discretionary, thus it had no jurisdiction. The Court pointed out that once the Administrator had made the determination that the statutory requirements had been met, "there is a nondiscretionary duty to act in accordance with his determination." 572 F.2d at 1355. This holding is applicable to the present case. The Administrator exercised discretion in determining whether the statutory requirements had been met, but once he made the determination that the requirements had been satisfied, he was under a mandatory duty to act in accordance with the statute by giving formal notification to the Governors. The relevant case law uniformly upholds the determination that sections employing the word "shall" in the Clean Air Act signify mandatory duties. *See Train v. Natural Resources Defense Council,* 421 U.S. 60, 79, 95 S.Ct. 1470, 1481, 43 L.Ed.2d 731 (1975) (once statutory criteria are met, agency action is required); *Natural Resources Defense Council v. Train,* 545 F.2d 320, 328 (2d Cir.1976) (to hold other than that the use of "shall" in the statute is to render this mandatory language mere surplusage);

*Oljato Chapter of Navajo Tribe v. Train,* 515 F.2d 654, 662 (D.C.Cir.1975) (it would be an abuse of discretion for the Administrator to fail to revise a standard of performance when the evidence supporting revision is compelling); *Citizens for a Better Environment v. Costle,* 515 F.Supp. 264 (N.D.Ill.1981); *Dow Chemical Company v. Costle,* 480 F.Supp. 315, 317 (E.D.Mich. 1978), *aff'd,* 659 F.2d 724 (6th Cir.1981). Therefore, the Court concludes that the duty of the Administrator to act according to the statute is nondiscretionary under section 115.

## IV. CONCLUSION

The Court concludes from the record before it that defendants' motions to dismiss and for summary judgment must be denied and that plaintiffs' motion for summary judgment should be granted. Having concluded that Administrator Costle properly invoked section 115 of the Clean Air Act, it now is incumbent upon the current EPA Administrator to "give formal notification" to the Governors of the states in which harmful emissions originate and to set in motion the necessary processes to require a plan revision so as to prevent or eliminate the endangerment encompassed by the Costle determinations. An appropriate Order accompanies this Memorandum.

## APPENDIX A

### UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

WASHINGTON, D.C. 20460

JAN 13 1931

Honorable Edmund S. Muskie
Secretary of State
Washington, D.C. 20242

Dear Mr. Secretary:

As you know, on December 17, 1980, the Canadian Parliament approved legislation providing the Canadian federal government with authority to abate emissions from Canadian sources which contribute to transboundary air pollution. On December 24,

1980, the Department of State announced that the United States would evaluate the Canadian legislation to determine whether it provides essentially the same rights as Section 115 of the U.S. Clean Air Act.

As required by the Clean Air Act, I have completed my review of the Canadian legislation. After consultation with the Department of State, I have concluded that the Canadian legislation provides the Government of Canada with authority to give the United States essentially the same rights as Section 115 of the Clean Air Act gives to Canada. In addition to this initial determination based on the language of the Canadian legislation, the Administrator must be able to determine that the Government of Canada is exercising or interpreting that authority in a manner that provides essentially the same rights to the United States. This second aspect of EPA's determination is necessarily a dynamic one which will continue to be influenced by Canadian action now and in the future.

Section 21.1(1) of the Canadian legislation provides that where the Minister of Environment has reason to believe that an air contaminant emitted by a Canadian source or sources creates or contributes to air pollution that may reasonably be expected to constitute a significant danger to the health, safety, or welfare of persons in another country, the Minister shall recommend to the Governor in Council (the highest federal executive authority) specific emission standards for the source or sources, in relation to the air contaminant, either alone or in combination with one or more other air contaminants, as he considers appropriate to eliminate or significantly reduce the danger. Under Section 21.1(2), if Minister proposes a recommendation, the notice of the proposal is to be published in the *Canadian Gazette*. A reasonable opportunity to make representations to the Minister concerning the proposal is to be offered to persons in Canada who would be affected by the prescription of specific emission standards, and to the endangered country.

For sources other than "federal" sources, Section 21.1(3) in effect requires that before making a final recommendation the Minister must consult with the appropriate province and provide the province with an opportunity to eliminate or significantly reduce the danger to the other country.

Section 21.2(1) authorizes the Governor in Council to prescribe specific emission standards recommended by the Minister if the Governor in Council concludes that the foreign country considered in making the recommendation under Section 21.1(1) has provided for "essentially the same kind of benefits in favor of Canada with respect to abatement or control of air pollution as is provided in favor of the country" by the Canadian Clean Air Act. In order to prescribe a specific emission standard with respect to non-federal sources, the Governor in Council must conclude that reasonable efforts by the Minister to procure reduction or elimination of the danger by the provincial government, have been unsuccessful.

As with most legislation, it is possible that the Canadian legislation could in the future be interpreted or implemented in a way that the United States would conclude that it was not being given essentially the same rights as are provided under Section 115. Thus, it is not possible to make a permanently binding determination that Canada has given the United States essentially the same rights based simply on a review of Canadian authorizing legislation. EPA first determines that Canadian legislation gives ample authority to the Government of Canada to provide essentially the same rights to the United States. Second, EPA must determine that the Government of Canada is exercising or interpreting that authority in a manner that provides essentially the same rights to the United States. This second aspect of EPA's determination is necessarily a dynamic one which will continue to be influenced by Canadian action now and in the future.

In my view, the amendments to the Canadian Clean Air Act do give adequate authority to the Government of Canada to provide essentially the same rights to the United States as Section 115 provides to

1488

Canada. Both Section 115 and Sections 21.1 and 21.2 authorize a federal official to make a finding or recommendation concerning endangerment to health or welfare of a foreign country due to any air pollutant emitted domestically, and to prescribe specific emission limits to eliminate, significantly reduce, or prevent the endangerment. The Canadian legislation refers to "significant danger to the health, safety or welfare of persons," thus my conclusion assumes this phrase will be interpreted to have essentially the same coverage as the Section 115 phrase "endanger public health or welfare." Both statutes allow the State or province, as appropriate, to take actions to remedy air pollution affecting a foreign country. If the State or provincial government fails to develop an adequate remedy the federal government is authorized to establish emission limitations. Each statute also requires that the federal government provide opportunities for public hearing on any proposed action and participation in the hearing by an affected foreign government.

The principal difference in the two statutes is the detailed procedural and substantive requirements applicable to the State plan revision process under the U.S. Clean Air Act as opposed to the more general requirement in the Canadian legislation for provincial consultation and reasonable efforts to secure action by the provincial government. In my judgment, that difference does not significantly restrict the ability of the Government of Canada to provide essentially the same rights to the United States. The Canadian requirement for federal consultation and efforts to procure provincial action fills the same role as the State plan revision process in the U.S. system. Consequently, I have concluded that, despite the differing process at the State and provincial levels, the Canadian legislation does provide the Government of Canada with ample authority to give essentially the same rights to the United States as are provided by Section 115.

I should observe that the provisions of the Canadian legislation do appear to provide the Minister of Environment with some discretion regarding the scope of the remedy he must recommend, as well as the adequacy of any remedies undertaken by the provincial government. Similarly, the Governor Council is apparently provided with discretion regarding final prescription of specific emission standards as is the case for all regulations issued under the Canadian Clean Air Act. For these reasons, my determination that the Canadian legislation provides essentially the same rights as Section 115 could be changed should the U.S. conclude that future Canadian actions interpreting or implementing their legislation were not giving essentially the same rights to the U.S.

In connection with my review of the recent Canadian legislation, I have also examined the *Seventh Annual Report on Great Lakes Water Quality* issued on October 1980 by the International Joint Commission (IJC). I have concluded that the IJC Report confirms that acid deposition is endangering public welfare in the U.S. and Canada and that U.S. and Canadian sources contribute to the problem not only in the country where they are located but also in the neighboring country. I am enclosing a letter which I have sent to Senator George Mitchell on this subject which discusses the IJC Report in greater detail and the implications of these conclusions with respect to any future actions by EPA pursuant to Section 115 of the Clean Air Act.

Sincerely yours,
/s/Douglas M. Costle
Douglas M. Costle

Enclosure

APPENDIX B

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

WASHINGTON, D.C. 20460

JAN 13 1981

Honorable George Mitchell
United States Senate
Washington, D.C. 20510

Dear Senator Mitchell:

Thank you for your letter of December 23, 1980 regarding Section 115 of the Clean

Air Act. As you are aware, this Section of the law requires EPA, if certain conditions are met, to call on States to revise their implementation plans where necessary to prevent or eliminate endangerment to public health or welfare in a foreign country stemming from air pollutants emitted in the United States.

Two recent actions require me to consider whether EPA should identify appropriate States for notification under this Section. First, in October 1980, the International Joint Commission submitted its *Seventh Annual Report on Great Lakes Water Quality.* That report contains a section describing damages due to transboundary air pollution and a recommendation that the Governments of the United States and Canada act to reduce certain air pollutants. Second, on December 17, 1980, the Canadian Parliament approved legislation providing the Canadian federal government with powers to abate transboundary air pollution. On December 24, 1980, the U.S. Department of State issued a public statement committing the United States to evaluate whether this Canadian legislation provides essentially the same rights as are provided by Section 115 of the Clean Air Act. The Clean Air Act requires the Administrator of EPA to make this determination.

There are two principal conditions which must be met before EPA can notify a State under Section 115 that a plan revision is required. First, the Administrator on receipt of reports, surveys, or studies from a duly constituted international agency must conclude that U.S. emissions are causing or contributing to endangerment in a foreign country, or must have received a request from the Secretary of State to notify a State. Second, before the provisions of Section 115 can be applied with respect to a foreign country, the Administrator must determine that the country provides the United States with essentially the same rights regarding international air pollution control as are provided by Section 115.

Your letter calls attention to certain reports which discuss problems of transboundary air pollution between the United States and Canada. As you are aware, the major focus of U.S.—Canadian concerns in the past two years respecting transboundary air quality has been on the question of the adverse impacts of acid deposition.

As my public statements over the past year have indicated, EPA has concluded that acid deposition, often referred to as acid rain, presents a genuine threat to our environmental well-being both in the U.S. and Canada. What we know or suspect about acid deposition indicates that the problem is genuine and serious:

—acid deposition can and has destroyed lake and stream ecosystems, killing fish and other water life;

—many lakes in Canada and the United States are already acidified and their fish populations are shrinking or are extinct;

—some soils are being damaged over time due to leaching of minerals and nutrients;

—the water and soils over extensive areas in North America are susceptible to acidification;

—stone buildings, monuments, and other building materials are eroded more rapidly by acid deposition;

—some important crops may be damaged by acid deposition and others may be injured by acidified soils;

—growth of forests may be reduced over time;

—over the long term some drinking water supplies may be contaminated by toxic metals leached from the soil as a result of acid deposition.

These kinds of impacts are within the range of impacts covered by Section 115. As you know, that Section is broadly drafted to encompass all forms of air pollution-related endangerment to public health or welfare and is not limited to interference with U.S. air quality standards or significant deterioration programs as is Section 126 of the Clean Air Act.

The relative contribution of U.S. and Canadian emission sources to acid deposition problems in the U.S. and Canada varies widely from location to location. The stress to our ecosystems created by acid

deposition is a function of the total atmospheric loadings of sulfur and nitrogen compounds. Surveys conducted over the past several years establish that there is a significant flow of these pollutants across the U.S.-Canadian border in both directions. Thus, we can say with some certainty that emission sources in the U.S. contribute significantly to the atmospheric leadings over some sensitive areas in Canada and that emission sources in Canada contribute significantly to the loadings over some sensitive areas in the United States.

Given our understanding of the impacts of acid deposition and of the joint contribution of U.S. and Canadian sources to the problem, I believe that the Section 115 authority could appropriately be used to develop solutions, provided that either the Secretary of State requests action or that any relevant reports of international agencies state the existence of the problem and that Canadian law and practice provide the U.S. with essentially the same rights respecting emission sources located in Canada.

The International Joint Commission which is a duly constituted international agency under Section 115, has recently transmitted a report which addresses the issue of acid deposition. My review of the October 1980 *Seventh Annual Report on Great Lakes Water Quality of the International Joint Commission* (IJC) leads me to conclude that the IJC has found acid deposition results in significant harm in both the U.S. and Canada and that emission sources in both the U.S. and Canada contribute to the problem through the long-range transport of air pollution. The IJC Report states that "[a]cidic precipitation is one widely known and serious example of a problem associated with the long-range transport of airborne pollutants." (Report at 49). The Report states that "[v]irtually all of eastern Canada and portions of the northeastern United States experience rains with acidity equal to or exceeding that which can adversely affect susceptible ecosystems. All parts of the Great Lakes watershed are now receiving precipitation containing 5 to 40 times more acid than would occur in the absence of atmospheric

emissions. Many inland lake ecosystems in the most susceptible parts of the Basin may be irreversibly harmed within 10–15 years." (Report at 50). The Report also notes that "[a] substantial portion of the Great Lakes drainage basin is potentially susceptible to acidic precipitation, based on its bedrock geology. The Sudbury, Muskoka and Haliburton areas of Ontario and the Adirondacks of northern New York are among the most heavily impacted areas in the world because their geology offers little buffering capacity to their inland lakes. Some lakes in the Haliburton-Muskoka area have lost 40–75 percent of their acid neutralizing ability in a decade or less. These areas are now being subjected to precipitation which is twice as acidic as that which caused losses of major fish stocks in thousands of Scandinavian lakes." (Report at 50).

The Report points out "the massive and diffuse nature of the [emission] sources throughout eastern North America" (Report at 54) and notes that acid deposition often occurs "many hundreds of miles from the source." (Report at 50).

Finally, the IJC recommends in the Report that the Governments of the United States and Canada, "undertake further actions to reduce atmospheric emissions of the oxidès of sulfur and nitrogen from existing as well as new sources." (Report at 5).

I have concluded that this report confirms my previously stated position that acid deposition is causing significant environmental problems on both sides of the U.S.-Canadian border due to emissions from U.S. and Canadian sources.

The question of whether Canada "has given the United States essentially the same rights" with respect to emission sources in Canada as is provided by Section 115 requires consideration of recently enacted Canadian legislation.

On December 17, 1980, the Canadian Parliament approved legislation which provides the Canadian federal government with authority to adopt emission standards for sources which contribute to air pollution

related problems in another country. Specifically, Section 21.1(1) of the legislation provides that where the Minister of Environment has reason to believe that an air contaminant emitted by a Canadian source or sources creates or contributes to air pollution that may reasonably be expected to constitute a significant danger to the health, safety, or welfare of persons in another country, the Minister shall recommend to the Governor in Council (the highest federal executive authority) specific emission standards for the source or sources, in relation to the air contaminant, either alone or in combination with one or more other air contaminants, as he considers appropriate to eliminate or significantly reduce the danger. Under Section 21.1(2), if the Minister proposes a recommendation, the notice of the proposal is to be published in the *Canadian Gazette*. A reasonable opportunity to make representations to the Minister concerning the proposal is to be offered to persons in Canada who would be affected by the prescription of specific emission standards, and to the endangered country.

For sources other than "federal" sources, Section 21.1(3) in effect requires that before making a final recommendation the Minister must consult with the appropriate province and provide the province with an opportunity to eliminate or significantly reduce the danger to the other country.

Section 21.2(1) authorizes the Governor in Council to prescribe specific emission standards recommended by the Minister if the Governor in Council concludes that the foreign country considered in making the recommendation under Section 21.1(1) has provided for "essentially the same kind of benefits in favor of Canada with respect to abatement or control of air pollution as is provided in favor of the country" by the Canadian Clean Air Act. In order to prescribe a specific emission standard with respect to non-federal sources, the Governor in Council must conclude that reasonable efforts by the Minister to procure reduction or elimination of the danger by the provincial government, have been unsuccessful.

As with most legislation, it is possible that the Canadian legislation could in the future be interpreted or implemented in a way that the United States would conclude that it was not being given essentially the same rights as were provided under Section 115. Thus, it is not possible to make a permanently binding determination that Canada has given the United States essentially the same rights based simply on a review of Canadian authorizing legislation. EPA first determines that Canadian legislation gives ample authority to the Government of Canada to provide essentially the same rights to the United States. Second, EPA must determine that the Government of Canada is exercising or interpreting that authority in a manner that provides essentially the same rights to the United States. This second aspect of EPA's determination is necessarily a dynamic one which will continue to be influenced by Canadian action now and in the future.

In my view, the amendments to the Canadian Clean Air Act do give *adequate authority to the Government of Canada to provide essentially* * the same rights to the United States as Section 115 provides to Canada. Both Section 115 and Sections 21.1 and 21.2 authorize a federal official to make a finding or recommendation concerning endangerment to health or welfare of a foreign country due to any air pollutant emitted domestically, and to prescribe specific emission limits to eliminate, significantly reduce, or prevent the endangerment. The Canadian legislation refers to "significant danger to the health, safety or welfare of persons," thus my conclusion assumes this phrase will be interpreted to have essentially the same coverage as the Section 115 phrase "endanger public health or welfare." Both statutes allow the State or province, as appropriate, to take actions to remedy air pollution affecting a foreign country. If the State or provincial government fails to develop an adequate remedy the federal government is authorized to

* Emphasis not in original.

▆▆▆▆▆▆▆▆▆▆▆▆▆ establish emission limitations. Each statute also requires that the federal government provide opportunities for public hearing on any proposed action and participation in the hearing by an affected foreign government.

The principal difference in the two statutes is the detailed procedural and substantive requirements applicable to the State plan revision process under the U.S. Clean Air Act as opposed to the more general requirement in the Canadian legislation for provincial consultation and reasonable efforts to secure action by the provincial government. In my judgment, that difference does not significantly restrict the ability of the Government of Canada to provide essentially the same rights to the United States. The Canadian requirement for federal consultation and efforts to procure provincial action fills the same role as the State plan revision process in the U.S. system. Consequently, I have concluded that, despite the differing process at the State and provincial levels, the Canadian legislation does provide the Government of Canada with ample authority to give essentially the same rights to the United States as are provided by Section 115.

I should observe that the provisions of the Canadian legislation do appear to provide the Minister of Environment with some discretion regarding the scope of the remedy he must recommend, as well as the adequacy of any remedies undertaken by the provincial government. Similarly, the Governor Council is apparently provided with discretion regarding final prescription of specific emission standards as is the case for all regulations issued under the Canadian Clean Air Act. For these reasons, my determination that the Canadian legislation provides essentially the same rights as Section 115 could be changed should the U.S. conclude that future Canadian actions interpreting or implementing their legislation were not giving essentially the same rights to the U.S.

As you know, Section 115 is activated by giving formal notification to the Governor of a specific State. EPA has not yet determined which State or States will require notification under Section 115. I have in-

structed my staff to examine this issue and to develop recommendations regarding the States which should receive formal notification. Notification to a State under the Clean Air Act is only the first of several steps in the plan revision process. After receiving a plan revision notification, the State must identify and propose control measures to address the problem and provide opportunity for public hearing prior to adoption and submittal to EPA.

Several factors will require that EPA make extraordinary efforts to consult and cooperate with affected States in this process. The acid deposition problem is clearly a regional one which crosses numerous State boundaries. The affected States will need to discuss the problem with one another and EPA will need to assist them in this effort. Second, since there are no established numerical standards by which to assess the adequacy of acid deposition mitigation measures, EPA and the affected States will have to work closely on developing target levels for State and regional emission reductions.

In summary, I believe the IJC Report confirms that acid deposition is endangering public welfare in the U.S. and Canada and that U.S. and Canadian sources contribute to the problem not only in the country where they are located but also in the neighboring country. Regarding the requirement of reciprocol rights, I believe the new Canadian legislation provides the Government of Canada with ample authority to give the United States essentially the same rights as Section 115. While this conclusion is adequate to warrant the initiation of a Section 115 based plan revision process in appropriate States, I must emphasize that during such a process and at the time of any final action, the Administrator must continue to be able to find that Canada is giving the United States essentially the same rights based on an evaluation of Canada's interpretation and implementation of its legislation.

I appreciate your interest in this very important subject. EPA will continue to

keep your office informed of its actions on this matter.

Sincerely yours,
/s/Douglas M. Costle
Douglas M. Costle