**NATURAL RESOURCES DEFENSE COUNCIL, INC., Petitioner,**

v.

**Lee M. THOMAS, Administrator, U.S. Environmental Protection Agency, et al., Respondents,**

**Alabama Power Co., et al., Intervenor.**

No. 86–1305.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 22, 1988.

Decided May 3, 1988.

David G. Hawkins, Washington, D.C., for petitioner. Richard E. Ayres, Washington, D.C., also entered an appearance for petitioner.

Eileen T. McDonough, Dept. of Justice, with whom, Roger J. Marzulla, Acting Asst. Atty. Gen., Francis S. Blake, Gen. Counsel, Alan W. Eckert, Associate Gen. Counsel, Charles S. Carter, Asst. Gen. Counsel, and Patricia A. Embrey, E.P.A., Washington, D.C., were on the brief, for respondents. Lawrence R. Liebesman, and

Bradley S. Bridgewater, Dept. of Justice, Washington, D.C., also entered appearances for respondents.

Henry V. Nickel, F. William Brownell, and Mel S. Schulze, Washington, D.C., were on the brief, for respondent-intervenors, Alabama Power Co., et al.

Before EDWARDS, BUCKLEY and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

Concurring opinion filed by Circuit Judge HARRY T. EDWARDS.

SENTELLE, Circuit Judge:

This case involves a petition by a public interest environmental group, National Resources Defense Council, Inc. (NRDC), to have this Court review the choice of the Administrator of the Environmental Protection Agency (EPA) between two monitoring methods in enforcing the National Ambient Air Quality Standards (NAAQS) for sulfur oxides. On the Court's last occasion to consider the Administrator's choice some seven years ago, the Court held it could not address the issue unless and until the EPA did so first in a "properly noticed rulemaking." *PPG Industries, Inc. v. Costle*, 659 F.2d 1239 (D.C.Cir.1981). While the posture of the present petition differs from that of the one before the Court in *PPG Industries*, the fundamental principles of judicial review of administrative proceedings have not changed, such a rulemaking has not yet occurred, and the result, or non-result, must be the same. We will, therefore, for the reasons set out below, dismiss the petition and once again make no determination on the merits of either method of monitoring.

BACKGROUND

While the statutory and administrative landscape upon which the present controversy stands was painted in some detail by Judge Bazelon in the *PPG Industries* decision, *supra*, some further sketching of the terrain is necessary to an understanding of this decision. Since the enactment of the

Clean Air Amendments of 1970, Pub.L. No. 91–604, 84 Stat. 1676,[1] the EPA has been the federal component in a system of shared federal and state responsibility for reducing air pollution. Under §§ 108 and 109 of the Clean Air Act, 42 U.S.C. §§ 7408–09, the EPA is charged with identifying air pollutants that endanger the public health and welfare, and formulating NAAQS that specify the maximum permissible concentrations of these pollutants in the ambient air. *See Train v. NRDC*, 421 U.S. 60, 64–65, 95 S.Ct. 1470, 1474–75, 43 L.Ed.2d 731 (1975). Each state has nine months from the promulgation of an ambient air quality standard to adopt a "state implementation plan" (SIP) and submit the plan to EPA for approval. 42 U.S.C. § 7410. Each state has the right to adopt and enforce its own standards regarding emissions of air pollutants provided such state standard is no less stringent than any applicable federally mandated SIP provision.

In 1971, the EPA promulgated a series of NAAQS for sulfur oxides, measured as sulfur dioxide. These standards established maximum acceptable average concentrations for one year periods, 24–hour periods, and 3–hour periods. Any locality in which the concentration exceeds the allowable maximum for either 3–hour or 24–hour periods more than once during a year is subject to remedial restrictions under the Act. There are two basic types of analysis for determining average concentrations in air samples. The "block average" method involves averaging the pollutant concentrations in the air samples for non-overlapping periods, typically midnight to midnight in the case of the 24–hour averages, resulting in 365 separate averages per calendar year,[2] and 8 times that many or 2,920 3–hour averages.[3] The "running average" method involves continuous averaging of overlapping 24–hour periods (or 3–hour periods) and is designed to detect concentrations exceeding the allowable limits for 24–hour periods crossing midnight, which would not otherwise be discerned in an averaging method focusing on either of the two calendar days during which a portion of the exceedance occurred.[4] Obviously, an infinite number of such running average periods per year is possible, since the averaging could begin at intervals of one hour, one-half hour, one minute, one second, or theoretically, an infinitesimally small interval. However, no one contends here, or has contended throughout the protracted history of this controversy, that intervals smaller than one hour should be employed so that the running average method NRDC champions before us would result in 24 times as many daily averages as the block average method NRDC opposes.

From the promulgation of the sulfur oxide NAAQS in 1971 until 1977, the EPA interpreted the NAAQS as allowing compliance through block averaging. In 1977, the Office of Air Quality Planning and Standards recommended the use of running averages.[5] Thereafter in 1979, EPA promulgated monitoring rules requiring running averages. In 1981 in *PPG Industries, supra*, because of the Agency's failure to give adequate notice of the change in its long standing practice, we invalidated those rules. However, we did not require any rulemaking on the subject nor require the use by the EPA of either method of averaging but rather directed: *"If* on remand EPA wishes to require the reporting of running averages, it should conduct notice and comment proceedings to consider and explain its decision properly." *Id.* at 1250 (emphasis supplied).

1. The relevant statute as amended is now Pub.L. No. 95–95, 91 Stat. 685 (1977).

2. Obviously 366 in leap years.

3. Again, obviously 2,928 in leap years.

4. The same principle obviously applies for 3–hour running averages except that the critical "crossing" hour would occur eight times as often. Further discussion, while largely couched in terms of 24–hour monitoring, is generally applicable to 3–hour monitoring as well, subject to appropriate mathematical modification. For further clarification of the greater sensitivity of the "running average" method, see graph reproduced in *PPG Industries*, 659 F.2d at 1244.

5. U.S. EPA "Guidelines for the Interpretation of Air Quality Standards" (Rev. Feb. 1977) (Issue 7A).

The EPA conducted no rulemaking but continued the historic practice of permitting the use of the less stringent block average method while contemporaneously permitting the newer and more exacting running average.

NRDC, based on subsequent events, a further discussion of which will appear in the body of this opinion, contends that the question is now ripe for review. The EPA contends that this Court is still as much in need of a fuller administrative record for review as it was in 1981 and that the petition should, therefore, be dismissed. The EPA's objections are based in the related arguments of lack of ripeness and final agency decision which we will discuss in turn.

ANALYSIS

Because the questions of ripeness and final agency action are inextricably intertwined, some facts discussed under each heading will necessarily bear relevance to the other; but for convenience of understanding, we will set them out separately, together with subdivisions where necessary and appropriate.

A. *Ripeness*

■ 1. *The PPG remand*—NRDC, in an argument that partakes more of ingenuity than of candor, argues that this matter is properly before the Court because EPA has failed to comply with the remand order in *PPG Industries, supra.* NRDC argues: "The court remanded the record to EPA with instructions to address the running average requirement in properly noticed rulemaking." Brief of petitioner at p. 8. This proposition must be dispensed with as an apparently deliberate misreading of the prior decision. The *PPG* remand simply does not instruct the EPA to address the running average requirement or, for that matter, to do anything else other than refrain from requiring running averages under the voided, improperly noticed rulemaking. While the Court refused to declare running averages illegal as petitioners in that case sought, the Court plainly did not hold that the use of that method is

required. In addition to the language from that opinion quoted at 1090, *supra,* the conclusion of the opinion specifically states: "[T]his court is prepared to reconsider its interpretation of the 24–hour sulfur oxides standard *if and when* EPA has first addressed that issue." (emphasis added). Rather plainly, there is no instruction to address the issue but only a holding that if the issue is addressed, it must be addressed properly.

2. *The NRDC's "Petitions" and the Emison Memorandum*—After the decision in *PPG Industries, supra,* EPA took no further action to reinstate its regulations requiring the use of running averages. The status quo prevailing before the attempted regulatory change of 1979 returned. EPA conducted no rulemaking and promulgated no new rules. EPA, therefore, urges us to dismiss the petition as, it contends, there is no final agency decision from which to petition and no petition at the administrative level so there can be no denial for us to review. NRDC counters that it has in fact petitioned for rulemaking to require the use of running averages and that its petitions have been denied.

EPA is certainly correct as to the general proposition of law. General principles of administrative law require finality of decision, *FTC v. Standard Oil Co.,* 449 U.S. 232, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980), and a chance for the agency to deal with this specific question and make an adequate record thereon, *American Public Transit Ass'n v. Lewis,* 655 F.2d 1272 (D.C. Cir.1981). This Court has repeatedly applied these principles in EPA cases. *PPG Industries, supra.* As we expressly held in *Oljato Chapter of Navajo Tribe v. Train,* 515 F.2d 654 (D.C.Cir.1975):

(1) The person seeking revision of a standard of performance, or any other standard reviewable under Section 307 [of the Clean Air Act, then 42 U.S.C. § 1857h–5, now 42 U.S.C. § 7607], should petition EPA to revise the standard in question. The petition should be submitted together with supporting materials, or references to supporting materials.

(2) EPA should respond to the petition and, if it denies the petition, set forth its reasons.

(3) If the petition is denied, the petitioner may seek review of the denial in this court pursuant to Section 307.

*Id.* at 666. Therefore, unless NRDC is correct in its factual assertions concerning its petitions and the existence of final agency action, this case is not currently justiciable.

■ NRDC contends that it first petitioned EPA for a rulemaking establishing running averages as the sole proper methodology for implementation of the sulfur dioxide NAAQS in a letter to EPA dated November 21, 1984. That document is set out in its entirety as Appendix A to this opinion. Simultaneously with the filing of the letter, NRDC filed two petitions for review with this Court and with the Sixth Circuit. Not only does either a casual or careful reading of the letter fail to disclose that it is anything other than a petition for reconsideration of a specific EPA action relevant to the applicable NAAQS compliance in a specific locality (Summit County, Ohio), but the record reveals that the EPA in fact granted that petition for reconsideration, 50 Fed.Reg. 41,138 (1985), and that the NRDC voluntarily dismissed the petitions for review by the courts. To contend that this petition properly brought before the Agency the question of rulemaking to require the use of running averages, borders on the frivolous.

NRDC further contends that this Court should find an appropriate petition and a final agency action in the letter of NRDC to William Ruckelshaus, Administrator of EPA, dated December 18, 1984 (set forth in its entirety as Appendix B to this opinion), and the memorandum of Gerald A. Emison, Director, Office of Air Quality Planning and Standards, dated March 28, 1986 (Appendix C to this opinion). NRDC urges that we should find the letter to be a proper petition for rulemaking and the memorandum to be a final agency decision denying that petition. EPA contends that NRDC is wrong in all accounts. While we cannot accept, for reasons set out below,

EPA's proposition that the memorandum is not final agency action, we must agree that the letter is not a proper petition for the rulemaking NRDC seeks and, therefore, the memorandum can plainly not be a decision denying it.

■ By any reading what the NRDC asks in its December 18, 1984, letter, is compliance with this Court's remand in *PPG Industries, supra.* This can be construed to be a petition for a rulemaking adopting running averaging only if this Court's remand directs such a rulemaking. Since this Court's remand does not direct such a rulemaking (*see* Section A–1, *supra* ), the letter cannot be construed to be a proper petition. It then follows that a petition not made cannot be denied. Therefore, the memorandum cannot be a denial.

3. *Dismissal*—When this Court last faced the issues arising from the block versus running average controversy, its dismissal, while based on the lack of notice, proceeded in part from the lack of an adequate administrative record upon which to base review. The *PPG* opinion, relying on *Oljato Chapter of Navajo Tribe, supra,* suggested that the remand would provide the EPA an opportunity to require the reporting of running averages, if it wished, which, with proper notice and comment proceedings, would provide to petitioners (in this case as well as that) "ample opportunity to challenge [or support] EPA's interpretation of the sulfur oxides standard when the rule is taken up before the agency." *PPG Industries,* 659 F.2d at 1250. The opinion further suggested that "[a]lternatively, a petition may be filed directly with EPA to interpret or amend the standard[.]" *Id.* As the opinion further noted, either of these routes would have provided the reviewing court with an adequate agency record upon which to base review. Since neither of these alternative routes has been followed, this Court is still as much lacking in record for review as we were in 1981.

■ Even though, for reasons set out in Section B, *infra,* we find final agency action to exist here, this case remains unripe for review. Ripeness does not necessarily exist even where there is an Article III

case or controversy and a final agency decision. For example, in the recent case of *American Civil Liberties Union v. FCC*, 823 F.2d 1554, 1579 (D.C.Cir.1987), we declined to consider an interpretive rule to be "ripe for review when it has yet to be applied." We made that decision not because of any "fixed principle that interpretive rules yet to be applied are not subject to judicial review ...", but rather because "this court may, as a *prudential* matter, defer its review of an agency's interpretive rule where institutional interests favor deferral and the petitioners are unable to demonstrate sufficient 'hardship' to outweigh those interests." *Id.* at 1582, Edwards, J., concurring. (emphasis in original).

■ Here, even if we assume the existence of standing in the Article III case or controversy sense, and despite the existence of a final agency decision, the prudential aspects of the ripeness doctrine counsel against immediate decision of this issue. The prudential aspects of:

[T]he ripeness inquiry take into account pragmatic concerns regarding "the institutional capacities of, and the relationship between, courts and agencies." These concerns include "the agency's interest in crystallizing its policy before that policy is subject to judicial review." "The court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting," and "the petitioner's interests in prompt consideration of allegedly unlawful agency action."

*Better Government Ass'n v. Department of State*, 780 F.2d 86, 92 (D.C.Cir.1986). Therefore, even where the issues are otherwise suitable for judicial review, we must:

[D]etermine whether the court or the agency would benefit from postponement of review until the agency action or policy in question has assumed either a final or more concrete form. Finally, we examine the [petitioner's] interest in immediate review. In order to outweigh any institutional interests in the deferral of review, [petitioners] must demonstrate

'hardship,' i.e., that 'the impact of the administrative action could be said to be felt immediately by those subject to it in conducting their day-to-day affairs.'[6] *Id.*

Both elements for deferral of decision on prudential grounds are present. The agency has had no chance to crystallize its own decision in a proper rulemaking, and the petitioners have demonstrated no impact on their conduct of their day to day affairs arising from the EPA's approval of either or both methods of sulfur oxide sampling. In short, the issue remains as unripe for review as it was when last this Court vacated the EPA's prior pronouncement and remanded the question in *PPG Industries, supra.* While NRDC contends that the unavailability of running average data to their members creates such an immediate impact, it has not created such a sufficient impact for them to properly petition EPA for a rulemaking. As we did in *PPG Industries, supra,* we will remand the matter to EPA for further consideration by this Court if and when the question of averaging methods is addressed in a proper rulemaking and brought before us by a proper petition.

B. *Final Agency Decision*

Although the question of ripeness is dispositive of this petition, in light of our prior decision in *PPG Industries, supra,* we would be remiss if we did not consider the finality of decision at least potentially present in the Emison memorandum and the necessary construction of that memorandum in light of our prior decision and remand. As noted above, our former opinion left this controversy in the posture that the rule requiring running averages was stricken leaving the agency "free to ... continue using its *Guidelines* to encourage but not to require, the reporting of running averages." *PPG Industries, supra,* at 1251. The memorandum of Director Emison (Appendix C) declaring as it does that "we [EPA] have investigated this issue, and concluded that block averages are *the proper* interpretation," (emphasis sup-

---

6. *See also, Eagle–Picher Industries v. United* *States EPA,* 759 F.2d 905, 915 (D.C.Cir.1985).

plied), is a departure from that prior practice. Rather than indicating that block averages are *a* proper practice while allowing or even encouraging the running average methodology, as was the status quo recognized in *PPG Industries,* Emison's memorandum establishes block averages as the only officially proper method. Since this conclusion was reached without the use of a proper rulemaking, in this one particular at least, NRDC appears correct that EPA has acted inconsistently with the mandate of *PPG Industries.*

 EPA argues that the Emison memorandum cannot constitute final agency action because "in general, action by subordinate agency officials is not final agency action subject to judicial review." *Stauffer Chemical Co. v. FDA,* 670 F.2d 106 (9th Cir.1982) (citations omitted). While this is true as a general proposition of law, it is also true, as the Supreme Court has instructed us in *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), that "we are to apply the finality requirement in a 'flexible' and 'pragmatic' way." *CIBA–GEIGY Corp. v. U.S. E.P.A.,* 801 F.2d 430, 435 (D.C.Cir. 1986) (citing *Abbott Laboratories* ). In this case where the subordinate is the director of the relevant component unit of the administration, where no further action by the administrator is directly implicated, and where no further proceedings are noticed, it would appear that subordinate employees of the agency and, more importantly, cooperating state components of the compliance effort would be justified in construing the memorandum to be their marching orders. Therefore, in a flexible and pragmatic interpretation, we must find this memorandum of the Director to be a final agency action. Indeed in this case, by its literal terms, it would be agency action inconsistent with this Court's prior remand. While, for the reasons set forth above, the matter is not properly before us for review at this time, nonetheless, in aid of our own jurisdiction under the *PPG* remand, we would note that any construction of the memorandum departing from the practice set forth in our prior opinion must be without legal effect. Our construction of the memoran-

dum should impose no hardship on EPA since it has declared before this Court that the memorandum was intended only to clarify the prior procedure and not to change it. We would caution that the EPA might be wise to circulate that interpretation to all those who have received or who have had access to the Emison memorandum.

### CONCLUSION

For the reasons set forth above, the petition of NRDC is dismissed.

### APPENDIX A

### NATURAL RESOURCES DEFENSE COUNCIL, INC.

1350 New York Avenue, N.W.

Suite 300

Washington, D.C. 20005

202–783–7800

November 21, 1984

Honorable William D. Ruckelshaus

Administrator

U.S. Environmental Protection Agency

401 M Street, S.W.

Washington, D.C. 20460

RE: Petition for Reconsideration of EPA Action set forth at 49 *Fed.Reg.* 37754–56, September 26, 1984.

Dear Mr. Ruckelshaus:

Pursuant to Section 307(d)(7)(B) of the Clean Air Act and Section 4(d) of the Administrative Procedure Act the Natural Resources Defense Council, Inc. (NRDC) hereby petitions for reconsideration of the above action.

The action designates as attainment for sulfur dioxide a portion of Summit County, Ohio based on an unlawful, apparent revision of the National Ambient Air Quality Standard for sulfur dioxide ($SO_2$). The apparent revision of the $SO_2$ standard consists of an apparent decision by U.S. EPA

to interpret the 3–hour and 24–hour standards as not being violated even when available "running average" data for 3–hour and 24–hour concentrations indicate more than one exceedence of the standard in a year.

Such a revision of the SO₂ standard is unlawful for the reasons set forth in Section I of the enclosed comment regarding EPA's proposed approvals of emission limits for certain plants in Ohio (49 *Fed.Reg.* 37642, 37644, Sept. 25, 1984). In addition, to the points raised in the enclosed comments we note that a memorandum dated January 29, 1982 from Regional Administrator Adamkus to Assistant Administrator Bennett ("Use of Running Averages for Determining Compliance with the 24–hour Sulfur Dioxide Standard") disclosed EPA's knowledge of "running average" data demonstrating multiple exceedences of the 24–hour standard in Summit County, Ohio. Notwithstanding its knowledge of these data EPA has, without presenting any reasoned basis for its decision, refused to consider these data in determining the attainment status of Summit County, Ohio.

It was impracticable for NRDC to raise these objections prior to this time because of (1) the lack of adequate notice in the proposed rulemaking notice of EPA's decision to refuse to examine available running average data in the Agency's possession in determining the attainment status of areas with respect to the short-term SO₂ standards, and (2) the unavailability of a number of EPA memoranda of central relevance to this proceeding until just recently.

EPA's November 23, 1982 notice of proposed rulemaking failed to provide adequate notice of the Agency policy on block versus running averages and the implications of the policy. The notice asserted in a footnote (n. 2) that a policy existed. However, it did not describe what the policy was nor did it discuss the implications or basis for the policy. The notice did not disclose that EPA was in possession of running average data showing violations of the SO₂ standard and did not disclose that EPA intended to ignore such data in proposing to approve the redesignation re-

quest. Treatment of such data was not identified as an issue and the notice solicited no comment on the topic. Nor did the notice give any hint that the undescribed "policy" noted in the footnote overturned the established Agency interpretation of the SO₂ standards set forth in EPA's 1977 *Guidelines for the Interpretation of Air Quality Standards.*

In short, the notice provided no indication that it had any significant policy implications for SO₂ control or interpretation of the SO₂ standard. Accordingly, NRDC was not put on notice to coment on these issues.

Moreover, documents of central relevance to the proceeding were not available until recently. For example, the January 19, 1982 memo from Regional Administrator Adamkus disclosing EPA's knowledge of violations of the standard was not made available until November 6, 1984. In addition, an August 24, 1981 opinion by the EPA General Counsel on the running average issue was made available only recently. This document demonstrates that the policy statement elliptically cited in the notice of proposed rulemaking conflicts with EPA's considered legal opinion on the subject.

We urge reconsideration of EPA's apparent policy to ignore running average data in evaluating compliance with SO₂ standards. Such a policy violates the law. It attempts to revise the SO₂ standards without following the procedures set forth in § 307(d) of the Clean Air Act. It will result in increased exceedences of the short-term SO₂ standards not just in Summit County, but throughout the United States as other sources seek (or preserve) SIP limits based on such a policy. The policy will result in increased loadings of SO₂ to the atmosphere with attendent increased harm due to acid deposition, materials damage, visibility impairment and other health and welfare impacts.

Finally, the policy appears to have been decided upon without any reasoned analysis by one or two officials who are no longer with the Agency. The record does not indicate whether any reasoned analysis

of the policy and its implications has occurred since your arrival at the Agency.

For these reasons we urge that you grant this petition for reconsideration so that the issue of Agency use of running average data can be discussed openly based on carefully considered, publically available analyses of the legal and environmental implications of the Agency's policy choice.

Sincerely,
/s/ David G. Hawkins
DAVID G. HAWKINS

DGH/jab

APPENDIX B

NATURAL RESOURCES DEFENSE COUNCIL, INC.

1350 New York Avenue, N.W.

Suite 300

Washington, D.C. 20005

202–783–7800

December 18, 1984

Hon. William D. Ruckelshaus

Administrator

U.S. Environmental Protection Agency

401 M Street, S.W.

Washington, D.C. 20460

Re: Remand in *PPG Industries, Inc. v. Costle,* 659 F.2d 1239 (D.C.Cir.1981)

Dear Mr. Ruckelshaus:

On July 30, 1981 the U.S. Court of Appeals for the D.C. Circuit decided the above case concerning EPA rules for air quality monitoring. The court held that EPA had failed to provide adequate notice regarding the rules requirement to report sulfur dioxide ($SO_2$) air quality data on a "running average" basis. In remanding the rules to EPA the court directed EPA to conduct a "properly noticed rulemaking" relating to the running average issue (659 F.2d at 1251).

However, the Agency has failed to respond to this court remand. The Natural Resources Defense Council, Inc. (NRDC) requests that you take immediate action to initiate a response to the court's remand order.

NRDC and its members are adversely affected by EPA's failure to respond to the D.C. Circuit remand. First, as long as EPA fails to respond to the remand, states are not required to submit air quality data on a running average basis. As a result numerous periods which may show exceedances of the $SO_2$ standards are not required to be reported. Second, EPA has begun to take actions allowing more lenient control of $SO_2$ emissions which are premised on a "block average" interpretation of the $SO_2$ standard.

This block average interpretation conflicts with the running average interpretation adopted for the monitoring rules remanded by the D.C. Circuit. However, rather than consider this issue in a properly noticed rulemaking as required by the court, the Agency has simply decided by internal memorandum to abandon its running average interpretation of the $SO_2$ standard. We have discussed these EPA actions in our November 23, 1984 Petition for Reconsideration of EPA's September 26, 1984 redesignation of portions of Summit County, Ohio.

We ask that you act without further delay to adopt a prompt schedule for responding to the D.C. Circuit's remand order. We believe it should be possible for EPA and NRDC to agree on a schedule for action without applying to the court for relief. However, in the absence of an early and satisfactory reply from the Agency NRDC intends to seek an order from the D.C. Circuit compelling EPA to respond to its remand order.

Thank you for your consideration of this matter.

Sincerely,
/s/ David G. Hawkins
DAVID G. HAWKINS

DGH/jab

APPENDIX C

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY

Office of Air Quality Planning
and Standards

Research Triangle Park, North
Carolina 27711

March 28, 1986

MEMORANDUM

SUBJECT: Block Averages in Implementing $SO_2$ NAAQS

FROM: Gerald A. Emison, Director

Office of Air Quality Planning and
Standards (MD–10)

TO: Director, Air Divisions, Regions I–X

As you know, the past Agency policy has been to use block averages in implementing the 3–hour and 24–hour $SO_2$ NAAQS. The question has arisen whether block averages are indeed the proper interpretation of the NAAQS. We have investigated this issue, and concluded that block averages are the proper interpretation. Thus, we will continue to use block averages in actions implementing the 3–hour and 24–hour $SO_2$ NAAQS. This statement of interpretation is for the purpose of providing needed guidance for current and future implementation decisions; it is not intended to initiate a reexamination of already approved implementation plans. In addition, States will continue to be permitted to develop requirements that are more stringent than Federal requirements, as provided by section 116 of the Act.

If this issue arises in any implementation decisions, e.g., SIP revisions, redesignations, etc., please contact Tom Helms at FTS 629–5526 for assistance. Tom and his staff, along with OGC, are available to assist you in responding to comments or preparing support documents on this issue.

cc: R. Campbell

B. Steigerwald

Chief, Air Branch, Regions I–X

HARRY T. EDWARDS, Circuit Judge, concurring:

I concur in Judge Sentelle's thoughtful opinion. I write separately, however, because this case poses an unusual problem in a unique set of circumstances, and because I believe that there are certain factors affecting our judgment that warrant emphasis.

The factual setting of this litigation is highly unusual. The regulatory practice, at least prior to Gerald Emison's memorandum of March 28, 1986, is uncontroversial. EPA assessed compliance with the NAAQS for sulfur oxides using both block averages and running averages, depending upon the data submitted to it. Our decision in *PPG Industries* made plain that EPA could not *require* exclusive use of either block averages or running averages without first conducting informal rulemaking in accordance with the Administrative Procedure Act. Both in its brief and in oral argument before this court, EPA asserted that it has not departed from the regulatory status quo. Nevertheless, Emison's memorandum appears, on its face, to be an authoritative agency statement requiring the use of block averages.[*] Complicating the picture further is the court's suggestion in *PPG Industries* that affected parties who are convinced that EPA's use of either block averages or running averages is improper should petition for rulemaking, so that the agency might adopt a definitive position on this long-contested issue. For reasons that are difficult to fathom, NRDC has neglected to submit such a petition, and thus has

---

[*] The memorandum reads, in pertinent part:

The question has arisen whether block averages are indeed the proper interpretation of the NAAQS. We have investigated this issue, and concluded that block averages are the proper interpretation. Thus, we will continue to use block averages in actions implementing the 3–hour and 24–hour $SO_2$ NAAQS. This statement of interpretation is for the purpose of providing needed guidance for current and future implementation decisions....

Memorandum of Gerald A. Emison, Director, Office of Air Quality Planning and Standards (Mar. 28, 1986), *reprinted in* Supplemental Appendix at 1.

forgone the surest means of resolving this dispute.

For the second time, we deny a petitioner's challenge to the regulatory status quo, and advise NRDC to petition EPA to enunciate its position on this matter before seeking relief in this court. We do so, however, with some pause. EPA's contention that Emison's memorandum does not constitute final action by the EPA Administrator is one we categorically reject. Emison occupies a position of authority with respect to the choice of averaging methodology. Government counsel acknowledged in oral argument before this court that Emison's instructions would unquestionably be heeded by EPA employees and be regarded as determinative by state officials. Because the memorandum is undoubtedly final agency action, we would ordinarily reach the merits of NRDC's challenge.

For prudential reasons, however, we demur. EPA's repeated insistence that Emison's memorandum does not represent a break with the status quo permitting use of both averaging methods renders the agency's position equivocal. The Administrator's silence on this question increases the ambiguity of EPA's stance. Given the uncertainty surrounding EPA's position, and in view of the fact that NRDC does not strenuously object to continuation of the status quo that EPA maintains is still in existence (notwithstanding Emison's memorandum), we think dismissal the wisest course. If NRDC desires clarification of EPA's position, or if it wishes EPA to require exclusive use of running averages in assessing compliance, it should petition EPA to institute a rulemaking proceeding. EPA would have to respond to that petition in one of several ways. It could deny the petition and reaffirm the permissive status quo. Or it could commence rulemaking in accordance with NRDC's request. Or it could embrace the views propounded in Emison's memorandum, thereby repudiating the status quo. In any case, NRDC would then possess a clear statement of

agency policy with respect to which it could seek judicial review.