**HER MAJESTY THE QUEEN IN RIGHT OF ONTARIO, Ian G. Scott, Q.C., Attorney General of Ontario, Jim Bradley, Minister of the Environment of the Province of Ontario, and Michael B. Vaughan, Petitioners,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent,**

Alabama Power Co., et al., National Coal Ass'n, Adirondack Mountain Club, Inc., Intervenors.

**Nos. 88–1778, 88–1780 and 88–1812.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 15, 1990.

Decided Aug. 31, 1990.

Bruce J. Terris, with whom James M. Hecker (for Her Majesty the Queen in Right of Ontario, et al.), Howard I. Fox (for Sierra Club and Izaak Walton League of America), Robert Abrams, Peter H. Schiff, David R. Wooley, and Joan Leary Matthews (for New York State Dept. of Law, Environmental Protection Bureau), Ann Seha (for the State of Minn.), J. Wallace Malley, Jr. (for the State of Vermont), Gary Powers (for the State of R.I.), James Tierney (for the State of Me.), Brian Comerford (for the State of Conn.), Charles Holtman (for the State of N.H.), James M. Shannon and Lee Breckenridge (for the Com. of Mass.), Paul Schneider (for the State of N.J.), and Hope Babcock (for Natl. Audubon Society) were on the briefs, for petitioners Her Majesty the Queen in Right of Ontario, et al. Jocelyn F. Olson also entered an appearance for petitioners.

Karen L. Egbert, Attorney, Dept. of Justice, with whom Richard B. Stewart, Asst. Atty. Gen., and E. Donald Elliott, Gen. Counsel, Alan W. Eckert, Associate Gen. Counsel, Charles S. Carter, Asst. Gen. Counsel, E.P.A. ("EPA"), and Steven M. Wellner, Atty., EPA, were on the brief, for respondents. Roger J. Marzulla also entered an appearance for respondents.

Henry V. Nickel, with whom Michael L. Teague, F. William Brownell, and Norman W. Fichtborn (for Alabama Power Co., et al.) and Michael B. Barr and Bruce D.

Peterson (for National Coal Ass'n) were on the joint brief, for named intervenors.

Thomas A. Ulasewicz was on the brief for intervenor Adirondack Mountain Club, Inc.

Bruce J. Terris and James M. Hecker were on the brief for amici curiae Her Majesty the Queen in Right of New Brunswick, et al.

Richard A. Wegman and Harold G. Bailey, Jr. were on the brief for amicus curiae the Government of Canada.

Before WALD, Chief Judge, and MIKVA and BUCKLEY, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

The question before us is whether the Environmental Protection Agency has any present obligation to take action under section 115 of the Clean Air Act, which establishes a procedure for the prevention of air pollutants in the United States from causing harm in the form of acid deposition to the public health and welfare in Canada. The Province of Ontario and a number of States and environmental groups have petitioned the EPA for a rulemaking that would essentially set in motion section 115's international pollution abatement procedures. We conclude, first, that section 115 does not require the EPA to initiate those procedures until it is able to identify the specific sources in the United States of pollutants that cause harm in Canada; and second, we are satisfied that the EPA is not as yet able to do so.

I. BACKGROUND

Section 115(a) of the Clean Air Act provides in relevant part as follows:

Whenever the Administrator, upon receipt of reports, surveys or studies from any duly constituted international agency has reason to believe that any air pollutant or pollutants emitted in the United States cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare in a

foreign country ..., the Administrator shall give formal notification thereof to the Governor of the State in which such emissions originate.

42 U.S.C. § 7415(a) (1982). The Administrator's finding that pollution emitted in the United States contributes to such air pollution is referred to as an "endangerment finding."

Under section 115(b), the notice to the Governor of the State in which such emissions originate is deemed to be a finding that its State Implementation Plan ("SIP") under the Clean Air Act is inadequate and must be revised to the extent necessary "to prevent or eliminate the endangerment." *Id.* § 7415(b); *see id.* § 7410(a)(2)(H)(ii). (SIP's impose controls upon individual polluters within each State sufficient to ensure that national ambient air quality standards are met.) This process is referred to as the "SIP revision" procedure.

The remedy provided by section 115 is applicable "only to a foreign country which the Administrator determines has given the United States essentially the same rights with respect to the prevention or control of air pollution occurring in that country as is given that country by this section." *Id.* § 7415(c). This determination is known as a "reciprocity finding."

The dispute in this case is whether the EPA has a present obligation, under section 115, to promulgate endangerment and reciprocity findings as proposed rules with respect to U.S. emissions that allegedly result in harmful levels of acid deposition in Canada. Acid deposition is believed to result primarily from the transportation of sulphur and nitrogen oxide emissions into the atmosphere where they are converted, by chemical processes, into acids that, in combination with water vapors, precipitate in the form of "acid rain," often many hundreds of miles from their source.

Acid rain is alleged to have serious detrimental effects on lakes and streams, soils, crops, building materials, forests, and drinking water. Yet considerable uncertainty and controversy attend the issue, and debate continues over the geographic areas affected by acid rain, the types and extent of damage involved, ambient concentrations and deposition levels, and the ability of scientists to identify the specific sources of the emissions in the United States and Canada that may contribute to each country's and its neighbor's acid rain problem.

The EPA's view of section 115 is that the endangerment finding under section 115(a) is inextricably linked to the requirement that it notify the States whose SIP's must be revised under section 115(b); in other words, the EPA believes that it need not make an endangerment finding until it is able to identify the sources of the pollutants. Otherwise, it will not be able to give the required notification. It then argues that because it currently lacks sufficient information to be able to trace pollutants affecting the Canadian health and welfare to specific sources in the United States, it is not obliged to make endangerment findings at this time. In sum, under the EPA's interpretation, section 115 requires a "unitary proceeding."

Conversely, in petitioners' view the section 115 remedial process may be implemented in stages. They note, first, that the endangerment finding requires only that the Administrator believe that sources within the United States—not in a particular State—are harming Canada, and contend that once the EPA is able to make endangerment and reciprocity findings, it must do so. Petitioners argue that once those findings are made, the statute mandates that the Administrator "shall" proceed with abatement measures even though he may not yet be able to pinpoint the specific sources. They conclude that the EPA has already effectively made endangerment and reciprocity determinations, and therefore it is obliged to publish them as proposed rules; and having made those determinations, the agency may not simply refuse to take *any* corrective action while it continues to study the problem. Petitioners do not base their argument on a belief that the EPA can in fact trace pollutants to their specific sources at the present time.

The case before us has its origins in two letters written in January 1981 by EPA

Administrator Douglas M. Costle to Secretary of State Edmund Muskie and Senator George Mitchell. *See New York v. Thomas,* 613 F.Supp. 1472, 1486–93 (D.D.C.1985) (reproducing the two letters), *rev'd,* 802 F.2d 1443 (D.C.Cir.1986), *cert. denied,* 482 U.S. 919, 107 S.Ct. 3196, 96 L.Ed.2d 684 (1987). In the letter to Secretary Muskie, Administrator Costle concluded that "acid deposition is endangering public welfare in the U.S. and Canada and ... U.S. and Canadian sources contribute to the problem not only in the country where they are located but also in the neighboring country." *Id.* at 1488. Administrator Costle's finding was based on the Seventh Annual Report on Great Lakes Water Quality issued by the International Joint Commission, *id.,* an organization established by the United States and Canada. The IJC is concededly a "duly constituted international agency" for purposes of section 115(a).

In his letter, the Administrator also concluded that Canadian legislation regarding transboundary air pollution "provides the Government of Canada with authority to give the United States essentially the same rights as Section 115 of the Clean Air Act gives to Canada." *Id.* at 1487. Administrator Costle cautioned, however, that whether Canada in fact exercises or interprets that authority in a manner that provides essentially the same rights to the U.S. is a "dynamic" determination "which will continue to be influenced by Canadian action now and in the future." *Id.*

The Administrator's letter to Senator Mitchell contained the same assessments in somewhat greater detail, *id.* at 1488–93, with the additional statements that his conclusions on endangerment and reciprocity were "adequate to warrant the initiation of a Section 115 based plan revision process in appropriate States" and that he had instructed his staff "to develop recommendations regarding the States which should receive formal notification." *Id.* at 1492. Administrator Costle also issued his findings in a press release dated January 16, 1981.

Because the EPA failed to take any further action under section 115, in 1984 sev-

eral States, environmental groups, and private citizens filed suit under section 304(a)(2) of the Clean Air Act, 42 U.S.C. § 7604(a)(2) (1982), in the U.S. District Court for the District of Columbia. The plaintiffs alleged that the Costle letters imposed upon the EPA a duty to identify and issue SIP revision notices to those States contributing to acid rain in Canada, as provided in section 115. *New York v. Thomas,* 613 F.Supp. at 1476, 1481–86.

In July 1985, the district court granted summary judgment for plaintiffs, holding that the letters constituted both endangerment and reciprocity findings under section 115 and ordering the EPA to issue SIP revision notices to the appropriate States within 180 days. *Id.* at 1481–86; *see Thomas v. New York,* 802 F.2d 1443, 1446 (D.C.Cir.1986), *cert. denied,* 482 U.S. 919, 107 S.Ct. 3196, 96 L.Ed.2d 684 (1987). The court was concerned about the passage of time since the reciprocity determination had been made, however, and allowed the EPA an opportunity to determine whether that conclusion remained valid. 613 F.Supp. at 1484. In October 1985, EPA Administrator Lee M. Thomas found that reciprocity continued to exist. *See Thomas v. New York,* 802 F.2d at 1446.

On appeal, this court reversed, reasoning that Administrator Costle's endangerment and reciprocity findings were rules under section 551(4) of the Administrative Procedure Act, 5 U.S.C. § 551(4) (1988), and therefore could not be promulgated without notice and comment procedures. *Thomas v. New York,* 802 F.2d at 1446–48. As the Costle findings had not been subjected to these procedures, they could not serve as the basis for judicial relief. *Id.* at 1448. The court did not address the issue of whether the EPA was obliged to promulgate such findings, nor did it address their validity.

On April 7, 1988, the Province of Ontario ("Ontario") and a number of States and environmental groups (collectively, "New York") filed petitions for rulemaking with the EPA under section 553(e) of the APA, 5 U.S.C. § 553(e) (1988), requesting the EPA to promulgate endangerment and reciproci-

ty findings pursuant to section 115 of the Clean Air Act. The petitions assert that four reports of duly constituted international agencies support an endangerment finding, that the reciprocity requirements of section 115(c) have been satisfied, and that Administrator Costle has specifically made both endangerment and reciprocity findings which have never been revoked by the EPA. The petitions do not request the EPA to identify the responsible sources or States or to prescribe emissions reductions or other remedial actions, as petitioners view those actions as part of the separate notification and SIP revision processes.

After the lapse of several months without a response, petitioners requested a meeting with EPA officials. The EPA agreed, and a meeting was held on September 9, 1988, with Mr. Don R. Clay, Acting Assistant Administrator for Air and Radiation. At the meeting, petitioners inquired into the status of their petitions and requested that the EPA provide a timetable for addressing them. Mr. Clay refused, but agreed to respond to their concerns in writing.

On October 14, 1988, Mr. Clay sent letters to counsel for the Ontario and New York petitioners. Letter from Don R. Clay to James M. Hecker (Oct. 14, 1988) ("Ontario Letter"); Letter from Don R. Clay to David Wooley (Oct. 14, 1988) ("New York Letter"). The letter to Ontario's counsel explained that it was written in response to counsel's request "for a report on the status of our consideration of those section 115 petitions." Ontario Letter at 1. The first paragraph of the letter contains the following disclaimer: "As discussed in our September 9 meeting, this letter represents only my thoughts on this issue, and does not necessarily reflect the position of the Administrator." *Id.* Mr. Clay also stated: "I do not believe that EPA presently has a sufficient information base to undertake the regulatory program required by section 115.... For that reason ..., I believe it would be premature to rule on your petition at this time." *Id.* at 2.

Then, after describing the EPA's ongoing efforts directed at the acid rain prob-

lem, Mr. Clay addressed the interpretation of section 115, declaring that "we continue to hold the view that section 115 is a unitary proceeding which can not be segmented, since the prescribed findings and notification are inextricably interrelated," and that "our present understanding of the acid rain problem is not sufficient to make a judgment regarding the state by state, or even the aggregate reductions necessary to eliminate observed effects." *Id.* at 3. Mr. Clay then stated that "in the absence of that understanding, I do not believe it would be prudent to initiate a regulatory program." *Id.*

The letter concludes as follows:

In closing, I would like to assure you that we will continue to assess our ability to take action on your petition as we precede [sic] with our ongoing acid rain work. However, at least for the near future, I can not recommend that the Administrator take the discretionary act of making the findings required to trigger the section 115 requirements.

*Id.* at 4. The New York letter is substantially the same.

Petitioners now seek review of the Clay letters as final agency action denying their petitions for rulemaking.

## II. DISCUSSION

Petitioners argue that the EPA has denied their rulemaking petitions, and that its denial was arbitrary, capricious, and not in accordance with law because once the EPA is able to make endangerment and reciprocity findings, it *must* publish them for notice and comment and thereby initiate the remedial process established by section 115. The EPA asserts that we lack jurisdiction over this matter because there has been no final agency action, and that the matter is not ripe for review. The EPA also defends its interpretation of section 115 as reasonable. We address the justiciability issues first, then turn to the merits.

### A. Final Agency Action

Section 307(b)(1) of the Clean Air Act, the jurisdictional provision invoked in these petitions, provides for judicial review of final

action by the Administrator. 42 U.S.C. § 7607(b)(1) (1982). Accordingly, the threshold question presented is whether we have jurisdiction to review the Clay letters as final action by the Administrator denying petitioners' rulemaking petitions. The EPA claims that the letters simply respond to petitioners' request to be apprised of the status of their petitions and contain nothing more than one subordinate agency official's views with respect to them. The agency maintains that as the letters neither deny nor grant the petitions, they have no direct or immediate effect on the rights of petitioners.

To determine finality, courts must decide "whether the agency's position is definitive and whether it has a direct and immediate ... effect on the day-to-day business of the parties challenging the action." *Ciba–Geigy Corp. v. EPA,* 801 F.2d 430, 435–36 (D.C.Cir.1986) (internal quotes omitted); *see also FTC v. Standard Oil Co. of California,* 449 U.S. 232, 239, 101 S.Ct. 488, 493, 66 L.Ed.2d 416 (1980) (*"SOCAL"*). The inquiry seeks to distinguish a tentative agency position from the situation where "the agency views its deliberative process as sufficiently final to demand compliance with its announced position." *Ciba–Geigy,* 801 F.2d at 436. When an agency position is merely tentative, judicial intervention may "den[y] the agency an opportunity to correct its own mistakes and to apply its expertise" and "leads to piecemeal review which at the least is inefficient and upon completion of the agency process might prove to have been unnecessary." *SOCAL,* 449 U.S. at 242, 101 S.Ct. at 494, *see also Ciba–Geigy,* 801 F.2d at 436.

 Although the EPA emphasizes that it has taken no final action with respect to the petitions, "agency inaction may represent effectively final agency action that the agency has not frankly acknowledged." *Sierra Club v. Thomas,* 828 F.2d 783, 793 (D.C.Cir.1987). When administrative inaction has the same impact on the rights of the parties as an express denial of relief, judicial review is not precluded. *Id.* Similarly, the absence of a formal statement of the agency's position, as here, is

not dispositive: An agency may not, for example, avoid judicial review "merely by choosing the form of a letter to express its definitive position on a general question of statutory interpretation." *Ciba–Geigy,* 801 F.2d at 438 n. 9. These principles are consistent with the "flexible and pragmatic way" in which we apply the finality requirement. *Id.* at 435 (internal quotes omitted); *accord NRDC, Inc. v. Thomas,* 845 F.2d 1088, 1094 (D.C.Cir.1988).

 On applying the foregoing principles, we conclude that the Clay letters represent final agency action as to the EPA's interpretation of section 115. In other words, although (as we discuss below in part II–C) the EPA concededly made no final decision on petitioners' request that the section 115 remedial process be initiated, it clearly and unequivocally rejected, on the basis of its construction of section 115, petitioners' requests for a separate proceeding limited to the endangerment and reciprocity findings. This is demonstrated by the following language from Mr. Clay's letter to the Ontario petitioners:

> Contrary to your view on the divisibility of the process under Section 115, *we* continue to hold the view that section 115 is a unitary proceeding which can not be segmented, since the prescribed findings and notification are inextricably interrelated. Making the findings in the manner in which you request would trigger a vast regulatory mechanism which *we* currently do not believe *we* can undertake in an informed manner.... *[O]ur* present understanding of the acid rain problem is not sufficient to make a judgment regarding the state by state, or even the aggregate reductions necessary to eliminate observed effects.

Ontario Letter at 3 (emphasis added).

The EPA contends that this statement merely represents the views of a subordinate agency official and thus cannot be considered final action by the EPA Administrator that is subject to judicial review under section 307(b)(1) of the Clean Air Act. *See* 42 U.S.C. § 7607(b)(1). While it is true, as the EPA emphasizes, that Clay explicitly cautioned that his letters repre-

sented his own views and not necessarily those of his agency, there can be little doubt that in this instance, he was speaking for the EPA. This is underscored by his shift from the first person singular consistently used elsewhere in the letter to the collective "we" when asserting the unitary construction of section 115. In so doing, he was clearly speaking in an official rather than a personal capacity. Moreover, in his capacity as Acting Assistant Administrator for Air and Radiation, Mr. Clay was the "principal advisor to the Administrator in matters pertaining to air and radiation programs," 40 C.F.R. § 1.41 (1989), and we have no reason to question his authority to speak for the EPA. *See Ciba–Geigy*, 801 F.2d at 437; *NRDC, Inc. v. Thomas*, 845 F.2d at 1094.

Finally, there is nothing tentative about the EPA's interpretation of section 115; it is unambiguous and devoid of any suggestion that it might be subject to subsequent revision. *See Ciba–Geigy*, 801 F.2d at 437. Furthermore, the interpretation is hardly new: The EPA has adhered to it at least since 1984, when the first lawsuit was filed to compel the issuance of SIP revision notices, and Mr. Clay's pronouncement that "we *continue* to hold [that] view" can hardly be described as equivocal. *See* Ontario Letter at 3 (emphasis added); *New York v. Thomas*, 613 F.Supp. at 1482–86.

Thus, by adhering to the position that section 115's procedures are not divisible, the Clay letters serve to confirm a definitive position that has a direct and immediate impact on the parties; namely, the denial of their requests that the EPA promulgate endangerment and reciprocity findings even though it is not prepared to proceed with the SIP notification and revision process. The agency's failure to issue a more formal interpretation is irrelevant, as Mr. Clay's statement represents "effectively final agency action [construing section 115] that the agency has not frankly acknowledged." *Sierra Club v. Thomas*, 828 F.2d at 793.

B. Ripeness

■ The EPA also asserts that even if it is deemed to have taken final action, the petitions are not ripe for review. *See NRDC, Inc. v. Thomas*, 845 F.2d at 1092–93. Under the Supreme Court's decision in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967), we consider "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." The ripeness doctrine generally prevents courts from becoming "entangled" in "abstract disagreements over agency policy" and from improperly interfering in the administrative decisionmaking process. *Abbott Laboratories*, 387 U.S. at 148, 87 S.Ct. at 1515. The EPA contends that neither part of the ripeness test is satisfied here.

The first prong of the test, fitness for review, measures the interests of both court and agency in postponing review. *Ciba–Geigy*, 801 F.2d at 434. We consider such factors as whether the issue presented is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final. *Id.* at 434–35; *see also State Farm Mut. Auto. Ins. Co. v. Dole*, 802 F.2d 474, 479 (D.C.Cir.1986), *cert. denied*, 480 U.S. 951, 107 S.Ct. 1616, 94 L.Ed.2d 800 (1987). The EPA argues that petitioners' claims involve complex technical and factual determinations and serious policy considerations that should not be addressed until the agency has stated its position in a more definitive and concrete form.

We disagree. The issue presented is a purely legal question of statutory interpretation—that is, whether section 115 obliges the EPA to promulgate endangerment and reciprocity findings even when it is unable to follow through with notification to specific States. Petitioners do not challenge the technical and factual aspects of the EPA's acid rain research; they challenge only its failure to take action under section 115 on the endangerment and reciprocity issues. Our resolution of the question will not benefit from the development of further information; nor will it interfere prematurely with the EPA's own consideration of the issue, as the Clay letters represent a

definitive statement of the agency's position.

As we noted in *National Recycling Coalition, Inc. and Environmental Defense Fund, Inc. v. Reilly*, 884 F.2d 1431, 1434 (D.C.Cir.1989), " '[w]here the first prong of the [*Abbott Laboratories* ] ripeness test is met and Congress has emphatically declared a preference for immediate review ... no purpose is served by proceeding to the second prong' " (quoting *Eagle–Picher Industries, Inc. v. EPA*, 759 F.2d 905, 918 (D.C.Cir.1985)). Here, as in *National Recycling*, Congress has "declared a preference" for prompt review by providing that:

> Any petition for review [of a final action of the Administrator] under this subsection shall be filed within sixty days from the date [of] notice of such promulgation. . . .

42 U.S.C. § 7607(b)(1). We therefore hold that the question of statutory interpretation presented by petitioners is ripe, and move on to the merits of the EPA's interpretation of section 115.

### C. The Merits

■ In reviewing an agency's interpretation of a statute it administers, we first determine, using traditional tools of statutory construction, "whether Congress has directly spoken to the precise question at issue." *Chevron U.S.A. Inc. v. NRDC, Inc.*, 467 U.S. 837, 842–43 & n. 9, 104 S.Ct. 2778, 2781 & n. 9, 81 L.Ed.2d 694 (1984). If the intent of Congress is clear and unambiguous, "that intention is the law and must be given effect." *Id.* at 843 n. 9, 104 S.Ct. at 2781 n. 9. If, on the other hand, the statute is silent or ambiguous with respect to a specific issue, then we "must defer to the agency's interpretation ... so long as it is reasonable and consistent with the statutory purpose." *Ohio v. United States Dep't of the Interior*, 880 F.2d 432, 441 (D.C.Cir.1989); *see also Chevron*, 467 U.S. at 843, 104 S.Ct. at 2781.

We are unable to draw any "unmistakable conclusion" as to whether Congress intended proceedings under section 115 to be unitary or divisible. *See Ohio*, 880 F.2d at 441. The statutory language can be read either way, and the legislative history is meager and unilluminating. And although, as we explain below, the structure of the statute tends to support the EPA's view, we believe it falls short of expressing a clear and unambiguous congressional intent. Under the second step of the *Chevron* analysis, however, we comfortably conclude that the EPA's view of section 115 is permissible, as it is both entirely reasonable and consistent with the statutory plan.

Section 115(a) provides that "[w]henever" the Administrator, based on certain reports or studies, has "reason to believe" that an air pollutant emitted in the United States causes or contributes to air pollution that may reasonably be anticipated to endanger health or welfare in a foreign country, he *"shall* give formal notification thereof to the Governor of the State in which such emissions originate." 42 U.S.C. § 7415(a) (emphasis added). The words "whenever" the Administrator "has reason to believe" imply a degree of discretion underlying the endangerment finding. Once that finding is made, however, the remedial action that follows is both specific and mandatory—the Administrator "shall" notify the Governor of the specific State emitting the pollution and require it to revise its SIP.

The statute thus creates a specific linkage between the endangerment finding and the remedial procedures: Once the endangerment finding is made, the SIP revision process *must* follow. As a result, if there is insufficient information to enable the Administrator to implement those remedies, the promulgation of an endangerment finding alone would largely be pointless. For this reason, the EPA's view that the Administrator must have sufficient evidence correlating the endangerment to sources of pollution within a particular State before he can exercise his discretion to make endangerment findings is both reasonable and consistent with the statute.

Our view of the EPA's interpretation is further supported by section 115(b), which mandates a revision of the polluting State's SIP. Under subsection (b), the Administrator's notice to the Governor represents a finding that the State's SIP must be re-

vised "with respect to so much of the ... plan *as is inadequate to prevent or eliminate the endangerment referred to in subsection (a) of this section.*" 42 U.S.C. § 7415(b) (emphasis added). This provision reinforces the linkage between the endangerment finding and the remedy that Congress has prescribed. If the EPA does not have a sufficient base of knowledge to trace endangering pollutants to sources within specific States, then a simple endangerment finding would leave subsection (b) without effect. The unitary approach adopted by the EPA avoids that result.

██ Having decided that the EPA's interpretation of section 115 is permissible, we must next address whether, under that interpretation, the agency's refusal to initiate rulemaking proceedings was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See American Horse Protection Ass'n v. Lyng,* 812 F.2d 1, 4 (D.C.Cir.1987). On this issue, we hold that the Clay letters do not represent final agency action, and we are therefore precluded from reviewing the EPA's present refusal to commence proceedings under section 115.

As the letters indicate, the agency has not made any final decision on whether endangerment and reciprocity findings can be made, nor has it conclusively determined whether it can adequately trace pollutants to specific sources in order to issue SIP revision notices. To the contrary, Mr. Clay explained that the EPA is actively working to develop the kind of information that would enable it to initiate section 115 abatement procedures upon making an endangerment finding. Given the complexity of the technical and factual issues that the agency is required to address in this case, we see little basis for questioning its own assessment of its current capabilities.

Our reluctance to intrude into the EPA's decisionmaking process at this time is consistent with the great deference we generally accord to an agency's "predictions within [its] area of special expertise, at the frontiers of science." *New York v. EPA,* 852 F.2d 574, 580 (D.C.Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1338, 103

L.Ed.2d 809 (1989). In addition, the agency's position as to the *application* of section 115 does not have any direct and immediate effect on the rights of petitioners, because the section 115 abatement process—as permissibly construed by the EPA—may yet be undertaken. Thus, applying the principles of finality discussed in part II–A above, we conclude that the EPA has not taken final action on petitioners' request for rulemaking—except, of course, to the extent they have requested a two-step proceeding.

██ Petitioners maintain, nevertheless, that judicial intervention is justified at this time because the EPA has delayed unreasonably in acting on Administrator Costle's endangerment and reciprocity findings, in violation of the Administrative Procedure Act's requirement that an agency "proceed to conclude a matter presented to it" within "a reasonable time." 5 U.S.C. § 555(b) (1988). *See, e.g., Public Citizen Health Research Group v. Commissioner, Food & Drug Admin.,* 740 F.2d 21, 32 (D.C.Cir. 1984). While we have previously held that we have jurisdiction to review claims of unreasonably delayed agency action under the Clean Air Act, *see Sierra Club v. Thomas,* 828 F.2d at 794–97, we do not believe the EPA's failure to proceed with rulemaking is unreasonable in this case. Given the permissibility of the EPA's view of section 115 as unitary, and the undisputed technical and scientific uncertainties that must be resolved in order to trigger section 115, we believe that such a delay is understandable.

We are, of course, fully aware that more than nine years have elapsed since Administrator Costle advised Secretary of State Muskie and Senator Mitchell of his conclusion that pollutants from sources in the United States were endangering the public welfare in Canada. But we are also aware of the unusual complexity of the factors facing the agency in determining the effects of acid rain and in tracing the pollutants from the point of deposition back to their sources. In fact, it was for the purpose, among others, of developing a better understanding of the acid rain phenomenon

that Congress enacted the Acid Precipitation Act of 1980, 42 U.S.C. §§ 8901–8912 (1982).

This statute initiated a ten-year program, commonly known as the National Acid Precipitation Assessment Program ("NA-PAP"), that is designed to identify the causes and sources of acid rain, to evaluate its environmental, social, and economic effects, and to assess potential methods of control. *See* 42 U.S.C. § 8903. We note that the final NAPAP report is due in December 1990. At oral argument the EPA pointed to this study as evidence of specific research being conducted that could enable the agency to take action under section 115; the EPA also asserted that the report should provide it with a sufficient basis to make a reasoned decision on the petitioners' rulemaking petitions.

It is in part on the basis of this information that we conclude that the EPA's delay in acting on the petitions has been neither arbitrary, nor capricious, nor contrary to law.

### III. CONCLUSION

We find that the Clay letters are final agency action and ripe for review on the specific issue of whether section 115 provides for a unitary or divisible proceeding. We also hold that the EPA's interpretation of section 115 as unitary is reasonable. Finally, we hold that the EPA, in applying its view of section 115, has not taken final action on petitioners' requests for rulemaking, which if granted would set in motion the whole of section 115's pollution abatement procedures. The petitions for review are therefore

*Denied.*